## GALLON *v.* HOUSE OF GOOD SHEPHERD.

1. FALSE IMPRISONMENT—CHARITABLE INSTITUTIONS.

   An institution of a general charitable character, which by statute is designated as a place of detention to which girls may be committed by certain courts, is not such a governmental agency that it is relieved of liability for false imprisonment of an infant not so committed.[1]

2. SAME.

   A corporation organized for charitable purposes, administering a charitable fund by providing a shelter for girls who may be exposed to corrupting influences, is liable for the torts of its servants in unlawfully detaining inmates, as for the breach of a non-delegable duty.[2]

3. SAME.

   The corporation is not excused from liability to pay such an inmate damages by the fact that a trust fund would thus be diverted.

4. SAME.

   The question of the validity of a release signed by plaintiff's ward, who stated that she executed it in ignorance of the contents because she was afraid, was for the jury.

5. DAMAGES—FALSE IMPRISONMENT—EXCESSIVE AMOUNT.

   A judgment of $2,500 for unlawfully detaining a girl of 16 years in a charitable institution for seven years is not excessive.

6. FALSE IMPRISONMENT—EVIDENCE—MOTIVE.

   To show motive not of a charitable kind, testimony is admissible in such action tending to prove that the labor of the inmate was profitable to the defendant, that advertisements were inserted in the papers to ascertain her whereabouts, and other efforts made by her relatives to find her.

[1] As to liability of eleemosynary institution maintained by State or municipality for personal tort of agent or servant, see note to *Leavell* v. *Western Kentucky Asylum for Insane* (Ky.), 4 L. R. A. (N. S.) 269.

As to liabilities of incorporated institutions belonging to the State generally, see note to *State, ex rel. Little,* v. *Board of Regents of University of Kansas* (Kan.), 29 L. R. A. 383.

[2] As to liability of charitable institution for negligence, see note to *Williamson* v. *Louisville Industrial School* (Ky.), 23 L. R. A. 200.

. Error to Macomb; Erskine, J. Submitted June 23, 1909. (Docket No. 72.) Decided October 4, 1909.

Case by Millie Gallon, guardian of Mabel Wellington, against the House of the Good Shepherd for false imprisonment of plaintiff's ward. A judgment for plaintiff is reviewed by defendant on writ of error. Affirmed.

*Franz C. Kuhn, Seth W. Knight,* and *Allan H. Frazer (Edwin Henderson,* of counsel), for appellant.

*Thomas A. Conlon (J. G. Tucker,* of counsel), for appellee.

Defendant was incorporated in the year 1884 under the provisions of Act No. 20, Laws 1855 (3 Comp. Laws, §§ 8264–8270), under the name "The Monastery and Asylum of the Good Shepherd." Amended articles of association were filed in the year 1889 in which the name of the society is "The House of the Good Shepherd," and the object of the organization is stated to be:

"The moral reformation of girls and women, and the preservation in a state of purity of girls and women whose virtue is exposed to danger."

The property of the association embraces some four acres of land, with buildings, situated on West Fort street in the city of Detroit, valued, according to reports filed with the secretary of State, in 1905 at $200,000, in 1906 at $100,000, in 1907 and 1908 at $50,000. The religious order in charge, a cloistered order, is that of "Our Lady of Charity of the Good Shepherd." It is one of 300 houses maintained in different places throughout the world, and the Mother House, so called, is at Angiers, in France. The institution is supported by contributions and by the earnings of the inmates. The women who are in charge receive no pay—no wages or salary—for services; their lives being devoted to charity. The rules of the order are promulgated from the Mother House, to which reports are made, but each house is, in business management and financial condition, independent. The institution admits,

irrespective of the religious training or beliefs of the applicant, three classes of women. A more accurate statement is that it classifies. those received as:. (*a*) Magdalens; (*b*) reformatory class, which includes wayward girls in danger of being led to evil; (*c*) preservation class, or innocents, children two years old and upwards. Inmates reach the institution through various channels. Some go there voluntarily. Some are received upon the request of parents, or those standing to them in the relation of parents. Officers of the law, as policemen and truant officers, bring some. By Act No. 271, Pub. Acts 1887 (1 Comp. Laws, § 2222), it is provided that police justices of the city of Detroit, justices of the peace of the county of Wayne, and the recorder's court of the city of Detroit shall have power, after the conviction of a girl over 7 and under 17 years of age of an offense for which she might be sent to the State industrial school for girls, when requested by a parent or guardian, to commit her to imprisonment in the House of the Good Shepherd, but not at the expense of the State. In such cases, except where sentence is imposed in the recorder's court, the commitment must be approved by a circuit or probate judge of the county, and the approval be indorsed upon the commitment before it is executed. Authority is conferred upon those in charge of the house to determine whether reformation warrants the discharge of the girl so committed, and to bind her out for the term of her commitment to suitable persons, reporting their action in the premises annually to the recorder's court. The number committed to the institution by the orders of the courts is very small. It does not appear that otherwise than as just stated is there reposed anywhere any public visitatorial power, or that reports are required to be made, or are made, to any State or other public authority, of the number, condition, cause, or time of detention of girls received into the institution. The real name of an inmate is not divulged, unless by herself, to other inmates, but upon entering the institution each is given a name by

which she is called so long as she remains there. Since the institution was opened, some 2,000 girls have been received in the reformatory class, and at the date of the trial of this case there were about 230 in that class. A rather extensive business is done in the laundry of the institution and in sewing. Four wagons are employed in collecting and distributing the work of the laundry to persons outside the institution. More than 200 girls and women are employed in the laundry. The inmates are not paid for their labor.

In her declaration the plaintiff avers that her ward and sister, Mabel Wellington, in June, 1898, being then 16 years of age, strong, well, and of good character and reputation, was induced by a person named in the declaration, under promise of procuring for her a place to work as a domestic in a small family, to go to the House of the Good Shepherd, in which institution, against her will and notwithstanding her repeated protests and requests, without the knowledge of her relatives, she was confined until some time in October, 1905, when her release was procured by her sister and brother, both of whom had during the period lived in Detroit; they having learned of her whereabouts from an escaped or discharged girl acquainted with the family. It is alleged, also, that she was compelled to work, was ill treated in various ways, and her physical and mental health much impaired. To the declaration the defendant pleaded the general issue.

Upon the trial the jury were instructed to allow no damages for impaired health, nor for injuries inflicted by other inmates of the house, and to give nothing by way of punishment of defendant or exemplary damages. They were told, in substance and effect, that the issue to be determined by them was whether Mabel was unlawfully restrained of her liberty by the defendant (*Smith* v. *Sisters of Good Shepherd*, 27 Ky. Law Rep. 1107 [87 S. W. 1083]), either from the time she entered the institution, or, if she entered voluntarily, then from a later time, and, if she was unlawfully restrained, to give her such dam-

ages as she had suffered for loss of time, physical discomfort, mortification, disgrace, as they found the facts to be. The jury returned a verdict of $4,000 in her favor, upon which judgment was entered. A motion for a new trial was made and heard. It was ordered that a new trial be awarded unless plaintiff would consent to remit $1,500 of the judgment. Plaintiff consented. Errors are assigned upon rulings refusing a directed verdict for defendant, admitting and rejecting testimony, upon the conduct of counsel for plaintiff, upon the charge given and refusals to charge as requested by defendant, and upon the refusal to order a new trial. As they are considered, and as is necessary, references will be made to the testimony.

OSTRANDER, J. (*after stating the facts*). A contention is made which goes to the right of the plaintiff to recover, assuming it to be established that her ward was unlawfully deprived of her liberty—imprisoned—by defendant. It is said (*a*) that defendant is a governmental agency; (*b*) that it is a public charitable institution. If it is either, it is not liable to plaintiff for the torts of its officers or servants. The notion that it is a governmental agency is predicated of the statute which has been referred to, which permits certain magistrates and courts to commit offenders to the institution. Assuming that defendant might legally detain a girl committed to its institution by one of the magistrates or courts named in the statute, it does not follow that the institution becomes, by force of this statute, a State institution or, within any definition applicable in this discussion, a governmental agency. In a sense, girls so committed are wards of the State (*Hunt* v. *Wayne Circuit Judges*, 142 Mich. 93 [105 N. W. 531, 3 L. R. A. (N. S.) 564]), confided to the custody of the defendant, upon the request of a parent or guardian, as they might be committed by State authority to the custody and care of an individual. Whatever the relation thus created between the State and the institution may be called, and whatever rights and duties would or

might arise out of such relation of the institution to the girl, it is clear that the general character of the institution is not changed. It remains, in fact and in law, the institution described in its articles of association.

The statute under which defendant is organized does not define a charitable purpose, but only that any three or more persons who may desire to become incorporated for any charitable purpose may do so. Societies organized under the provisions of the act, whose purposes are charitable, are charitable societies. The avowed object of the defendant is charitable. For the purposes of this case, it may be treated as occupying, in the view of the law, the position of a public charitable institution, administering a charitable fund. *Bruce* v. *Methodist Episcopal Church*, 147 Mich. 230 (110 N. W. 951, 10 L. R. A. [N. S.] 74). It administers the fund according to rules of its own adoption, by methods of its own choosing. It shelters, clothes, feeds, and instructs the inmates, requiring of them such labor in return as they can perform. Its buildings and premises are erected and arranged with the purpose of detaining those whom it desires to detain. It is intended that girls confided to the institution shall remain until discharged. While it appears that avenues are sometimes open by which an inmate may go out, it also appears that one who thereby goes out escapes. It is a place of detention. Concerning these matters, the record leaves no one in doubt. The rule that one who enters voluntarily may leave at pleasure, said to be in force in the institution, is a rule in recognition of the duty not to detain one not authoritatively committed to the care of defendant.

Upon the facts, the question presented is not one of the responsibility of defendant to those who voluntarily accept the shelter of the institution, to those committed to it by magistrates or courts, or to those detained at the request or by the consent of parents or guardians. It is not pretended that Mabel Wellington was there by order of court or by consent or at the request of parents or of relatives. It is admitted that after she went to the insti-

tution she was not outside its inclosing wall or fence until her release was applied for by her relatives. The jury were instructed that if she voluntarily entered the institution, or voluntarily remained there, thereby subjecting herself to its rules and discipline, she could not recover, and a verdict must be returned for defendant. The question, then, is one of the liability of defendant to one unlawfully detained in its institution—to one deprived of liberty without authority of the law.

To this question there can be but one answer. And liability may not be affirmed or denied upon any application of the doctrine of *respondeat superior*, if, indeed, upon the facts there is room for its application. The duty not to imprison a citizen in defendant's institution without lawful authority is not one which may be delegated to servants or agents so as to relieve the principal from responsibility. The argument that a trust fund will be diverted if used to indemnify the injured person, and therefore the defendant is not liable, was answered in *Bruce* v. *Methodist Episcopal Church, supra.* See, also, *Kellogg* v. *Church Charity Foundation*, 128 App. Div. 214 (112 N. Y. Supp. 566).

We come, then, to the consideration of errors alleged to have been committed in the conduct of the trial and in refusing a new trial. It was the theory of plaintiff, *first*, that Mabel was an involuntary inmate of the institution, held there against her will; *second*, that her treatment while there was improper and resulted in injury. As to the second proposition, it should be said that the specific objections to the admission and the exclusion of testimony upon that subject have become unimportant, for the reason that the whole matter was withdrawn from the consideration of the jury. Whether it should be said that defendant was prejudiced generally by receiving some of the testimony offered, the prejudice being reflected in the verdict which was rendered, is a separate matter, which will be later referred to. As to the first proposition, and whichever way one may conclude the

truth to lead, the testimony presents a very unusual condition of things. Assuming the girl to have been healthy, moral, of good reputation, with relatives in the city of Detroit interested in her welfare, to whose house she was free to go, a Protestant, with no particular religious tendencies, a girl who had by her own efforts found employment at various places, receiving and disposing of her earnings, the natural inference would be that she did not willingly immure herself in this institution for seven years as one of a class of girls supposed to need reformation. The facts assumed were supported by the testimony produced by plaintiff. We find nothing in this testimony which requires particular notice. None of these facts are seriously disputed by defendant, although testimony was offered tending to prove that upon entering she stated that she was a Catholic, and it is claimed, upon the whole record, that plaintiff is now manifesting an interest in her ward which is in marked contrast to the lack of interest displayed in her sister before she entered defendant's institution. A peculiar circumstance is that the relatives of Mabel who were witnesses discredit her mental soundness while presenting her, as they are obliged to do, as the principal witness for plaintiff. The sister discredits, not her truthfulness, but her mental competency, in having herself appointed to be her guardian. The brother discredits her in testimony such as the following:

"At present her mind is not what it should be, though she is improving. She is not completely competent to take care of herself, but far from it, and in some particulars she does not know the difference between right and wrong. I cannot say whether she knows the difference between the truth and a lie."

Whether, having proved the character of Mabel and her detention for seven years in an institution arranged and used as a place of detention, it was incumbent upon plaintiff to prove an involuntary detention, or whether it was then incumbent upon defendant to prove that she was a voluntary inmate, was a question not debated at the trial.

Plaintiff assumed, and it seems was compelled to carry, the burden of proving an involuntary detention. It is admitted that she went to the institution with Mrs. Goldsmith, who was at the time in charge of St. Mary's Home. Mrs. Goldsmith testified, in substance, that Mabel Wellington came to the home with a man whom she said she had met in a park, and had asked to show her the way, gave her name as Mabel Wright, said she had neither home nor relatives and that the man she was with had agreed to get her a position in some hotel if she would go that evening; that she considered that the girl was not very bright; that she needed protection, and told her she would take her to a home where she would be protected. She took her to the defendant's institution, and turned her over to one of the sisters, saying, "Here is a child I have brought to be looked after." She gave them no further information. Mary Howe has first charge of the reformatory class. Mabel, she says, was brought to her in the classroom by one of the sisters, and gave her name as Mabel Wellington. Later she talked with her, and made an entry of facts in a memorandum book. The entries are her name, the name of her father and mother, who she said were dead, and the name of her oldest sister, Mrs. A. H. Gallon, residence, 977 Russell street, Toronto, religion, Catholic. Mabel testified that Mrs. Goldsmith promised to give her a place as domestic in a family of three, that she took her to the defendant's institution, on a street car, late in the afternoon. Nothing was said to her there, and no one told her the name of the institution. She was taken to the classroom about supper time, was invited to eat, did so, went out in the yard after supper, and with other girls sat for an hour. Prayers were said, and she went to bed. She heard no conversation between Mrs. Goldsmith and those in charge of the institution. Two or three days later questions were asked her, and she signed her name in a book. She told where she was born; that her father and mother

were dead; the name of her sister, Mrs. Gallon; her address on Riopelle street in Detroit. She was asked nothing about her past life. In Canada, Mabel had gone to school to a convent. She knew that those in charge of the institution to which she was taken were members of some religious order. She disagrees with Mrs. Goldsmith in many respects, among others in respect to the time she was at St. Mary's Home. She says she had been there some days, and, having no money to pay for board and lodging, she assisted about the work; that her trunk was there, and she afterwards sent for it, and it was brought to defendant's institution.

If Mabel had known the character of this institution, and that she would not be permitted to leave it at her pleasure, there would be reason for the conclusion that she entered, and for a time at least, remained voluntarily —at least she did not enter protesting or because forced to do so. The point is not controlling here, however much the fact, if it exists, may be thought to explain or excuse the subsequent conduct of the defendant. There is abundant testimony, met by counter testimony on the part of defendant, tending to prove that, being there, those in charge proposed that she should remain whether she desired to remain or not, and her own testimony is to the effect that she soon sought to go away, and discovered the purpose of those in charge to prevent her doing so. Without entering into details, it is sufficient to say that the jury were warranted in finding that she was restrained of her liberty against her will. It is true that, after leav- the institution, and after an attorney had advised defendant that a claim for damages would be made, she signed and attested a document in which it is stated that while there she was treated with kindness; left at the request of her sister, and reluctantly; held the sisters in high regard; and released the convent and the order from "any claim whatsoever I might have by reason of remaining or being detained prior to my majority." But the manner in which this writing was procured, and the evidence as to whether it was voluntarily and intelligently made, was all

before the jury. The court was not in error in refusing to direct a verdict for defendant, and the verdict rendered was supported by testimony. The recovery is not excessive. If it is assumed that the persons in control of this institution believed they were acting for the best interests of this girl, it is nevertheless intolerable to the law that a person, *sui juris*, shall be restrained of liberty, without authority of law, by a stranger, because, in the judgment of the stranger, such person will thereby be morally or financially improved. The charge of the court was favorable to defendant, and neither in requests to charge refused, nor in the charge as given, do we discover any error.

The errors based upon rulings admitting and rejecting testimony have been examined, with the result that we find none of them well assigned. We are of opinion, and this answers most of the objections not already answered, that plaintiff was entitled to testimony which tended to prove a motive other than a merely charitable one upon the part of defendant for receiving and detaining this girl, and that it was proper to show the labor to which she was put, and the fact, if it was a fact, that her work was profitable to the institution. It was proper, also, to show that the disappearance of this girl was soon known to her relatives, and that persistent and continued efforts were made, by employing detectives and by advertising in the Detroit daily papers, without success, to ascertain her whereabouts. We have examined the record, too, to learn if it is probable that, in admitting testimony relating to issues of fact finally withdrawn from the jury, the defendant was prejudiced, and whether the conduct of counsel for plaintiff which is complained about should result in granting a new trial. We are not satisfied that prejudice to defendant resulted.

Finding no reversible error, the judgment of the court below must be, and it is, affirmed.

HOOKER, MOORE, MCALVAY, and BROOKE, JJ., concurred.