(135 App. Div. 163.)

### GARTLAND v. NEW YORK ZOÖLOGICAL SOCIETY.

(Supreme Court, Appellate Division, First Department. December 17, 1909.)

1. MASTER AND SERVANT (§ 332*)—NEGLIGENCE OF SERVANT—INJURY TO THIRD PERSON—CONTRIBUTORY NEGLIGENCE—ACTS IN EMERGENCY—QUESTION FOR JURY.

Plaintiff, the servant of an independent contractor, employed to connect certain steam fittings in the basement of a building occupied by defendant, while working in the basement coal hole adjoining the boiler room, suddenly heard a loud explosive sound caused by the sudden turning on of the blow-off of one of the boilers by defendant's servant without notifying plaintiff or his fellow workman, and, seeing a cloud of steam, plaintiff attempted to escape by passing in front of the boilers to the stairs, and in doing so he was injured by the escaping steam. Held, that plaintiff acted in an emergency, and hence was not negligent as a matter of law, though he might not have been injured had he remained where he was.

[Ed. Note.—For other cases, see Master and Servant, Dec. Dig. § 332.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2. CHARITIES (§ 45*)—CHARITABLE INSTITUTIONS—NEGLIGENCE OF SERVANT—
   RESPONDEAT SUPERIOR.
     Where plaintiff, a steam fitter's helper, while performing work in a
   building occupied by defendant Zoölogical Society, under a contract with
   plaintiff's employer, was injured by the negligence of an employé of de-
   fendant in blowing off its boilers located in such building kept and main-
   tained by defendant for purposes of recreation, incidental education, etc.,
   under a charter from the state and a contract with the city, plaintiff not
   being on the premises as a beneficiary of charity, defendant was liable
   for the negligence of its servants, even though it was a charitable insti-
   tution.
     [Ed. Note.—For other cases, see Charities, Cent. Dig. § 103; Dec. Dig.
   § 45.*]

3. MUNICIPAL CORPORATIONS (§ 747*)—INJURIES TO THIRD PERSONS—NEGLI-
   GENCE OF SERVANTS—GOVERNMENTAL AGENCY.
     The New York Zoölogical Society organized to encourage the study of
   zoölogy, furnish instruction and recreation to the people, and holding un-
   der a contract with the city possession of a building located on land of the
   city used for a public park, containing the city's aquarium, open on spec-
   ified days for the free use of the public, and having complete control of
   the employment and service of its employés, was not a governmental
   agency, and was therefore not relieved on that ground from liability for
   injuries to third persons due to the negligence of its employés in main-
   taining the property.
     [Ed. Note.—For other cases, see Municipal Corporations, Dec. Dig. §
   747.*]

4. MUNICIPAL CORPORATIONS (§ 747*)—GOVERNMENTAL DUTY.
     There is no governmental duty imposed on a municipality to provide
   parks, pleasure grounds, and collections of wild animals or fish, or paint-
   ings and books for the amusement and education of the people.
     [Ed. Note.—For other cases, see Municipal Corporations, Dec. Dig. §
   747.*]

Appeal from Appellate Term.

Action by Michael E. Gartland against the New York Zoological Society. From a determination of the Appellate Term (61 Misc. Rep. 643, 113 N. Y. Supp. 1087), affirming a judgment of the Municipal Court in favor of plaintiff, and from an order denying defendant's motion for a new trial, it appeals. Affirmed.

Argued before PATTERSON, P. J., and INGRAHAM, McLAUGHLIN, LAUGHLIN, and CLARKE, JJ.

Niles & Johnson (William W. Niles, of counsel), for appellant.
Robert Steward (Ralph G. Barclay, of counsel), for respondent.

CLARKE, J.  The plaintiff was a steam fitter's helper in the employ of one Gerstel, who had a contract with the city of New York, through the department of parks, for installing new boilers and connecting up the same in the Aquarium Building, Battery Park. Plaintiff and a fellow workman, Kelly, were connecting up some radiator pipes in the basement in the coal hole adjoining the boiler room containing two boilers. They were at work connecting these pipes to the ceiling, and were standing on top of a pile of coal. They suddenly heard a noise of escaping steam, and started for the stairs. They had to pass directly in front of the boilers. Plaintiff was injured by the escaping steam while trying to escape from the room. The exhaust

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

pipes of the boilers had for some time been disconnected from the drain pipe into which they usually led. Through these exhaust pipes the boilers were blown off. These boilers were under charge of Tyrrell, the fireman, and Harrison, the engineer, who were employed by the defendant. Harrison and Tyrrell knew that these men were working in the coal hole. Harrison had ordered Tyrrell to blow off the boilers, and had left the boiler room. The valve controlling the blow-off was at the back of the boilers. Tyrrell suddenly turned it on to blow off the boilers without notifying the plaintiff and Kelly.

There were questions of fact as to the negligence of Harrison and Tyrrell, and as to plaintiff's freedom from contributory negligence. Certainly upon hearing this loud explosive sound, and seeing this cloud of steam, Kelly and Gartland were not called upon to remain where they were, and possibly be boiled to death. They did what usually a man would do—attempted to escape through the only known means of exit. Plaintiff's conduct in a sudden emergency is not to be condemned because subsequent events might show a better procedure. It was for the jury to say whether under the circumstances he was free from negligence, and the question has been resolved in his favor.

The main question upon this appeal is whether the defendant corporation is responsible for the negligence of its employés, Harrison and Tyrrell, under the doctrine of respondeat superior. It is a corporation created under a special act (chapter 435, p. 778, Laws 1895), entitled "An act to incorporate the New York Zoological Society and to provide for the establishment of a zoological garden in the city of New York." Section 2 of the act provides that said corporation—

"shall have power to establish and maintain in said city a zoological garden for the purpose of encouraging and advancing the study of zoology, original researches in the same and kindred subjects, and of furnishing instruction and recreation to the people, and may purchase and hold animals, plants and specimens appropriate to the objects for which said corporation is created."

Section 4 provides that:

"No manager of said corporation shall receive any compensation for his services nor be interested, directly or indirectly, in any contract concerning its property or affairs."

Section 5:

"Said corporation may raise money by the issue of its bonds, secured by a mortgage, on any or all of its property not acquired from said city or state."

Section 6:

"Said corporation may take, purchase and hold real and personal estate necessary for the purpose of its incorporation, the net annual income of which shall not exceed $50,000, and shall possess the general powers and be subject to the restrictions and liabilities prescribed in the third title of the eighteenth chapter of the first part of the Revised Statutes."

Section 7:

"The commissioners of the sinking fund of the said city are authorized in their discretion to allot, set apart and appropriate, for the use of said corporation any of the lands belonging to said city north of One Hundred and Fifty-Fifth street, * * * said grounds thus set apart and appropriated shall be used for no purpose whatsoever except those aforesaid. As soon as any lands are set apart, the mayor of the said city of New York, and the

president of the department of parks of said city, shall become and be ex officio members of the board of managers."

Section 8:

"Admission to the said garden shall be free to the public for at least four days, one of which shall be Sunday, in each week, subject to such rules and regulations as shall be prescribed by said corporation."

Chapter 441, p. 1077, Laws 1902, entitled "An act to authorize a further appropriation for the New York Zoological Society for the support of the New York Aquarium," provides that:

"The board of estimate and apportionment of the city of New York may annually in its discretion, include in the budget for the then next ensuing financial year, in addition to any sum or sums which may be appropriated for the adequate support and maintenance of the New York Zoological Park or gardens, situated in the borough of the Bronx, and administered and controlled by the New York Zoological Society, a further sum or sums not exceeding $50,000, for the use of the said New York Zoological Society; Provided, however, that the additional appropriation hereby authorized shall be made only in case an agreement is entered into between the said New York Zoological Society and the city of New York, acting by its board of estimate and apportionment for the adequate keeping, maintenance, extension, preservation and exhibition of the building and approaches thereto and collections of aquatic animals and plants contained therein, known as the New York Aquarium situated in the Battery Park in the borough of Manhattan in said city, and also for furnishing opportunities for study, research and publication in connection with said collections, which contract the said board of estimate and apportionment is hereby expressly authorized, in its discretion, to make upon such terms and conditions as may be agreed upon with the said New York Zoological Society, and which contract shall also provide how the duty of the commissioner of parks for the boroughs of Manhattan and Richmond in respect to maintaining the said aquarium now imposed upon him by law shall be performed."

Section 626 of the Revised Charter (chapter 466, p. 264, Laws 1901) provides that:

"The commissioner for the borough of the Bronx is hereby authorized and directed to carry out the contract made by and between the department of public parks and the sinking fund commissioners * * * with the board of managers of the corporation known as the New York Zoological Society * * * if such a contract shall have been entered into prior to the passage of this act. If no such contract shall have been entered into, * * * said commissioner * * * with the consent and approval of the sinking fund commissioners, * * * is hereby authorized to enter into a contract in behalf of the city of New York with said New York Zoological Society allotting and setting apart for the use of said society, a tract of land in Bronx Park in said borough of the Bronx upon such terms and conditions as shall be approved by the said commissioner and said sinking fund commissioners."

Section 613 provides:

"It shall be the duty of the park commissioner for the boroughs of Manhattan and Richmond to maintain * * * the Aquarium in Battery Place."

October 13, 1902, a contract was entered into between the city, acting by its board of estimate and apportionment, and the New York Zoological Society, which recited chapter 441 of the Laws of 1902, and the desire of the city to transfer the entire control and management of the Aquarium, together with the equipment and collections contained therein. It was mutually agreed that the society, in consideration of the transfer to it of the use and possession of said build-

ing known as the New York Aquarium and its contents, agrees that it will during the existence of this agreement adequately keep, maintain, extend, preserve, and exhibit the said building and approaches thereto and collections of aquatic animals and plants contained therein. "As soon as practicable after the execution of this agreement, * * * the party of the first part shall transfer, and the party of the second part shall take over, the said building and contents; and from and after such date the party of the second part shall have the exclusive use and possession of the said building and its contents, subject to the provisions of this agreement." Except for damages by fire, "the party of the first part shall at all times keep in repair and in good condition the said building and approaches thereto, and also the machinery and stationary equipment contained therein, and shall make, at its own proper cost and expense, such changes, repairs, alterations or renewals in the building, machinery and stationary equipment as may from time to time be agreed upon between the party of the first part, acting by its commissioner of parks for the boroughs of Manhattan and Richmond, and the party of the second part." The city agreed to annually provide not less than $45,000, which should be expended by the party of the second part for the "adequate keeping, maintenance, extension, preservation, and exhibition of said building and approaches thereto, and for the increase, preservation, transformation, renewal and exhibition of the collections therein, and for scientific, educational and administrative work in connection therewith; for publication and the general expenses of the party of the second part in connection with the Aquarium; for the expenses of any expedition, or of any employé or employés of the party of the second part sent out for the purpose of increasing the collections of the Aquarium, or for educational or scientific work or study in connection therewith; for the expenses of the exhibition of any of the Aquarium collections in public schools or elsewhere; for books, maps, charts or other articles relating to or needed in the Aquarium; for the purchase of any or all machinery, apparatus, supplies, labels, pictures, paintings or other articles or equipment needed for the maintenance, renewal and extension of the collections of the study and display of the same, and for any and all expenses incurred in the prosecution, illustration and publication of scientific, artistic or other studies in connection with said collections. All the collections, equipment and other personal property now in the New York Aquarium shall remain the property of the party of the first part, but the party of the second part shall have the entire control and management and exclusive use of the same, and may at any time sell, exhibit, loan or exchange any or all of the specimens contained in such collections, or hereafter acquired, or purchase with money supplied by the party of the first part, provided, however, that the net proceeds of such sales or exchanges shall be devoted by the party of the second part solely to the benefit or increase of the collections in said Aquarium, and all property so acquired shall become and remain the property of the party of the first part. All property placed in the said Aquarium which may be purchased by the fund of the party of the second part and not contributed by the party of the

first part, shall continue to be and remain absolutely the property of the party of the second part." * * * "The said Aquarium shall be open and accessible to the public, without any charge or gratuity, on a portion, at least, of each and every day of the year." No admission shall be charged. The use of the library, apparatus, and collections shall be granted to all professors and teachers of the public schools or other institutions of learning upon such terms and conditions as the party of the second part may prescribe, but without any charge or gratuity. "During the existence of this agreement the said party of the second part shall have the absolute power to appoint, direct, control and remove all persons employed in and about said building and its collections, and to fix and adjust the salaries of all such persons; and shall be responsible for the same; and shall have power to make all rules and regulations respecting duties of all its employés in and about the Aquarium, and the general management and administration of the Aquarium and its collections without any restriction or limitation whatsoever, except as in this agreement contained." It is further provided that, whenever any approval or direction was required by the terms of the agreement, such direction should be by the commissioner of parks of the boroughs of Manhattan and Richmond.

To avoid liability, the appellant claims, first, that it is a charitable corporation and not liable in an action of this kind; second, that it was a mere trustee for a public purpose and is not liable for the negligent act, if any, which resulted in the injury to plaintiff; that it was a mere governmental agency acting for the municipality and entitled to the same immunities from liability for damages as is conceded to the city itself and to all its municipal divisions. We should have great difficulty in determining that this corporation, under its act of incorporation, its enabling act, and its contract with the city, was a charitable organization within the classification of any of the corporations which from time to time for one reason or another have been relieved of responsibility for the torts of their employés. It dispenses no alms. It relieves no suffering. It cares for no sick. While it is true it is not a money-making institution and its managers and members may not receive salaries or any monetary returns, this is not controlling. Its purposes and its work are to amuse and to instruct, and, if we were called upon to classify it, we should say that it came closer to an institution for recreation with incidental education than any other recognized classification.

But, even if it were a charitable institution, we think it would still be liable. Here is a tort committed by one of its employés by reason of which a person who was lawfully upon the property controlled by the defendant in the prosecution of a lawful work has received injury. He was not a beneficiary of a charity. Nor was the negligent employé in an independent employment, as a surgeon or a trained nurse. It seems to us that the case is governed by the recent decision in Kellogg v. Church Charity Foundation, 128 App. Div. 214, 112 N. Y. Supp. 566. In that case the action was to recover for injuries to the plaintiff by being run into in the street by an ambulance of the defendant by the negligence of the driver. In the opinion of the learned

Appellate Division in the Second Department a large number of cases were cited and examined, and the conclusion was reached that there was no exemption in the law by which a purely charitable organization could be relieved of responsibility upon the facts there presented for the negligence of its employé; that the doctrine of respondeat superior did apply. We are satisfied with the conclusion reached, and can add nothing to the discussion.

As to the claim that this corporation is a governmental agency, and therefore exempt, it is clearly not a governmental agency. The building in which the accident occurred is upon land of the city used for a public park, and, prior to the contract under which the defendant corporation now controls it, it was under the jurisdiction and management of the department of parks. But the city is responsible for torts committed by many of its agents and for negligence in the maintenance of its property. It is not responsible for the torts of the police (Woodhull v. Mayor, 150 N. Y. 450, 44 N. E. 1038), but it is responsible for the torts of its employés in the street cleaning department (Missano v. Mayor, 160 N. Y. 123, 54 N. E. 744). In the one case the police are engaged in a governmental function; in the other the street cleaners are performing a duty put upon the city to keep its streets clean, "in the exercise of which it is a legal individual as distinguished from its governmental functions when it acts as a sovereign." Its duty in regard to the condition of its streets and its parks and public places is not governmental, so that it is relieved from responsibility for negligence. This was settled, so far as the department of parks is concerned, by Ehrgott v. Mayor, 96 N. Y. 264, 48 Am. Rep. 622. Branches of the public service which have been held by the courts to exercise governmental functions are the fire department (Fire Ins. Co. v. Village of Keeseville, 148 N. Y. 46, 42 N. E. 405, 30 L. R. A. 660, 51 Am. St. Rep. 667), the charities and corrections department (Maxmilian v. Mayor, 62 N. Y. 160, 20 Am. Rep. 468), and the police department (Woodhull v. Mayor, 150 N. Y. 450, 44 N. E. 1038). But there is no governmental duty put upon the municipality to provide parks and pleasure grounds and collections of wild animals or fish, or paintings or books, except in the large sense that a great city may with propriety consider the æsthetic, and not be confined to the practical. But it is not the park department nor the city which is being sued for the tort of one of its employés. It is a private corporation with whom a contract has been made under which the absolute control of the building, and all its employés was intrusted to it. The language of the contract is that it shall have "the absolute power to appoint, direct, control and remove all persons employed in and about said building and its collections, and to fix and adjust the salaries of all such persons and shall be responsible for the same; and shall have power to make all rules and regulations respecting duties of all its employés in and about the Aquarium, without any restriction or limitation whatsoever, except as in this agreement contained." No public officer in the city of New York has any such power as that over his subordinates. Such freedom of action is now reserved solely to private em-

ployers.   Said Folger, J., in Maxmilian v. Mayor, 62 N. Y. 160, 20 Am. Rep. 468:

"This rule of respondeat superior is based upon the right which the employer has to select his servants, to discharge them if not competent, or skillful or well behaved, and to direct and control them while in his employ. Kelly v. Mayor, 11 N. Y. 432. The rule has no application to a case in which this power does not exist.   Blake v. Ferris, 5 N. Y. 48, 55 Am. Dec. 304.   It results from the rule being thus based that there can be but one superior at the same time and in relation to the same transaction."

The facts here shown bring this case within the doctrine so stated.

We find no authority to sustain the claims of the appellant, and we think there is every reason why we should reject them.   It controls parts of the city property upon which it states it receives millions of visitors every year.   Its control over such property and buildings, the appointment, direction, and discharge of its employés is absolute. With this power it should realize its responsibilities and be held to that measure of responsibility which every employer has to meet under the law.

The determination appealed from should be affirmed, with costs and disbursements to the respondent.   All concur.

