AMELIA ANDREWS, Appellee, v. YOUNG MEN'S CHRISTIAN ASSOCIATION, Appellant.

No. 44403.

FEBRUARY 15, 1939.

REHEARING DENIED JUNE 23, 1939.

Miller, Miller & Miller, for appellant.

Gillespie & Moody, for appellee.

BLISS, J.—This action was originally brought by Arthur Andrews, and on his death, his widow, as administratrix of his

estate, was substituted as plaintiff. There is little controversy as to the facts, either as pleaded or as testified to. The defendant is a corporation, organized and existing under the statutes of Iowa, and has been engaged in the work and activities usual to such associations. On December 31, 1935, the deceased, who was then employed by the Works Progress Administration of the United States Government, through some arrangement between his superiors and the defendant, was doing general repair work in a building owned and operated by the defendant in Des Moines. He was an excellent carpenter and very good at lock work. On the day in question, he and the superintendent of defendant's building were repairing a bracket on the basement door of the passenger elevator shaft. The superintendent had twice told the defendant's employee, who was operating the elevator, not to bring the elevator below the first floor, until he told him otherwise. The deceased was informed of this by the superintendent. No further instructions were given to the elevator operator. To do the repair work it was necessary to keep the collapsible doors open, and for the deceased to mount a ladder in the shaft pit to remove the bracket, and after welding it, to replace it. The superintendent aided him by holding a light. As the deceased was tightening the last screw, the elevator descended below the first floor and knocked the superintendent out of the doorway, and crumpled the body of the deceased on the ladder. He was taken to the hospital where he remained in a helpless and most painful condition until his death on February 26, 1937.

The plaintiff alleged freedom from contributory negligence on the part of the deceased and charged the injuries to the defendant's negligence. The defendant denied negligence and alleged that it was a corporation, not for profit, but solely for religious and charitable purposes. It introduced in evidence its charter, as amended and renewed, showing that the purpose of the association was the teaching and the study of the Bible among the young men of Des Moines and vicinity and to furnish facilities for mental, physical and religious development. Under its articles it had the power to acquire and hold real estate, to lease any portion thereof, and to devote its revenues to the furtherance of the objects of the asscociation. It had the power to sell, mortgage, or incumber any of the real estate. Its renewal charter provided that it was not organized for pecu-

niary profit. Its general secretary testified that it was conducted in accord with the provisions of its charters, and was operated as a character building institution to help young men and boys to a higher plane of living. Membership fees were charged and rental for the boys living in the building, but these fees and charges were not, and were not intended to be sufficient to meet expenses. The deficit between income and outgo was met by an annual community drive for funds.

The deceased was not on the payroll of the defendant. Arrangements had been made by the WPA through the Recreation Commission for him to work for the defendant, and in this arrangement the defendant was not to pay the deceased anything.

At the close of all of the testimony, the defendant filed a motion containing several grounds for a directed verdict in its behalf. The first ground, and the one we will first discuss, is based upon the fact that the defendant is a charitable corporation operating without pecuniary profit to its officers or to anyone else, and for that reason was not liable to the plaintiff for any negligence on the part of any of its employees or representatives. The motion was overruled. The defendant raised this and other objections by requested instructions, exceptions to instructions, and by motion for new trial. In all of these matters the court held adversely to the defendant. The defendant has appealed from all of these rulings and from the judgment for the plaintiff entered on the jury's verdict.

I. The question of the liability of a charitable institution to respond in damages for the negligence of its servants, employees or those in charge has been many times before the courts. It is one upon which there has been, and is, not only a conflict of decisions among the courts, but also a remarkable diversity of opinion among those of the courts which agree in their ultimate decision, as to the correct reason, or ground for so deciding. Every reason and ground advanced has been vulnerable to attack and criticism, and has been attacked and criticised.

Perhaps the first basis offered for this immunity from tort responsibility was the trust fund doctrine. The reason given therefor being that if the fund or property, which had been set apart for charitable uses, could be subjected to the payments of claims of persons injured through the negligence of those administering the trust, it would in time become so depleted as to

defeat the purposes of its creators or donors, and would dry up its sources, since no one would donate to a charitable purpose, if he thought that his donation would be diverted to the payment of such negligence claims. The first case announcing the doctrine of the nonliability of the trustees of a charitable trust for the negligence or misconduct of the trustees was The Foeffees of Heriot's Hospital v. John Ross in 6 Clark & Finelley's Reports 507, decided by the House of Lords in 1846. George Heriot, jeweller of King James VI of Scotland and I of England, by his last will, in 1623, directed that the residuum of his estate be devoted, in perpetuity, to the founding of a hospital, in Edinburgh, "for the maintenance, relief, bringing up, and education of so many poor fatherless boys, freemens' sons of that town," as the means would provide. Ross was denied admission and recovered damages. In reversing the judgment, the House of Lords, speaking through Lord Chancellor Cottenham, with the concurrence of Lords Brougham and Campbell, and on the authority of its decision in Duncan v. Findlater, volume 6 of the same reports, page 894, decided in 1839, said:

"The question then comes to this,—whether by the law of Scotland a person who claims damages from those who are managers of a trust fund, in respect of their management of that fund, can make it liable in payment. It is obvious that it would be a direct violation, in all cases, of the purposes of a trust, if this could be done; for there is not any person who ever created a trust fund that provided for payment out of it of damages to be recovered from those who had the management of the fund. No such provision has been made here. There is a trust, and there are persons intended to manage it for the benefit of those who are to be the objects of the charity. To give damages out of a trust fund would not be to apply it to those objects whom the author of the fund had in view, but would be to divert it to a completely different purpose."

Both the Findlater and the Heriot cases and also a similar decision in Holliday v. The Vestry of St. Leonard, 11 Common Bench N. S. 192, were overruled by the House of Lords, in 1866, in the cases of Mersey Docks and Harbour Board, Trustees, v. Gibbs et al., and Pierce et al., 11 H. of L. Cases 686, 14 Weekly Reporter 872, 14 Law Times Rep. 677. In those cases actions were brought against the trustees to recover damages for

injury to a ship and cargo, through negligence in maintaining the dock. The trustees contended that they were not liable since they were not paid and all dock dues were spent in paying for and maintaining the dock, and any surplus was to be used in reducing the docking charges. The trustees were nevertheless held liable. Since that time, as stated by the Supreme Court of Ontario, in Lavere v. Smith's Falls Public Hospital, (1915), 35 Ontario Law Rep. 98, the trust fund theory has no longer "any footing" in the law of England or Ontario.

The first court in this country to proclaim its adherence to the trust fund doctrine was the supreme court of Massachusetts in 1876, in McDonald v. Massachusetts General Hospital, 120 Mass. 432, 21 Am. Rep. 529. It gave the early English cases as its authority, apparently oblivious of the fact that the same court which had given the doctrine life, had put a quietus on it ten years before. Following the lead of Massachusetts, other courts in this country adopted the same rule. Some of them, however, fearful of a rule which practically placed charitable institutions above and beyond the law with respect to non-liability for their negligence, began to modify the rule. They refused to permit exemption from liability unless the charitable institution had shown due care in the selection of its servants and agents. Such an exception is wholly inconsistent with, and a repudiation of the trust fund doctrine, since an enforcement of the exception would, itself, effect a depletion of the trust fund. If the trust fund doctrine is sound, an institution, engaged in public charitable, eleemosynary, or religious work, could not be held responsible in tort to any plaintiff, so far as trust property might be used to discharge the liability. This doctrine has very generally been disapproved and rejected in this country. 13 R. C. L. 946; 11 C. J. 374, 378; Geiger v. Simpson Methodist Episcopal Church, 174 Minn. 389, 219 N. W. 463, 62 A. L. R. 716; Bruce v. Methodist Episcopal Church, 147 Mich. 230, 110 N. W. 951, 10 L. R. A. (N. S.) 74, 11 Ann. Cas. 150; Alabama Baptist Hospital Board v. Carter, 226 Ala. 109, 145 So. 443; Powers v. Mass. Homeopathic Hosp., 1 Cir., 109 Fed. 294, 65 L. R. A. 372; Hamburger v. Cornell University, 240 N. Y. 328, 148 N. E. 539, 42 A. L. R. 955; Glavin v. Rhode Island Hospital, 12 R. I. 411, 34 Am. Rep. 675; Annotations in 14 A. L. R. 572, 42 L. R. A. (N. S.) 1144; 10 American Jurisprudence 695, 696; Bruce v. Y. M. C. A., 51 Nev. 372, 277

P. 798; Sessions v. Thomas Dee Memorial Hospital, April 5, 1938, 94 Utah 460, 78 P. 2d 645; Gilbert v. Trinity House, 17 Queens Bench Division 795; Foreman v. Canterbury, L. R. 6 Q. B. 214. In various modified forms it is still accepted as the basis of the immunity, in some of the states. In fact, in Massachusetts, Kentucky, Missouri, Maryland, Illinois, and perhaps a few other states, the trust fund theory is still enforced with all of its original vigor and breadth, and there are no exceptions to the liability exemption.

Another ground given for this immunity from negligence liability, is that the rule or maxim of respondeat superior has no application in the relation of a charitable institution and its servants. This contention is bottomed upon the thought that the rule has application only where the master derives some profit or advantage to himself from what his servant does, and since a charitable institution makes no personal pecuniary profit from the endeavors of its servants, the rule has no application to it, and it is not responsible for their negligent acts. Some of the decisions which support this theory, notably, Hearns v. Waterbury Hospital, 66 Conn. 98, 33 A. 595, 603, 31 L. R. A. 224, speak of the respondeat superior rule as at times a hard rule, resting on public policy, and that it should not be extended to institutions of charity. Its enforcement may at times seem harsh, but it is based, not on public policy, but on the soundest principles of law and justice. This ancient maxim of the common law and its twin—"Qui facit per alium facit per se"— He who acts through another acts by or for himself—form the basis of the law of agency, and of other principles in the law of master and servant. They are founded on the principle that a duty rests on every person, individual, or corporation, in the management of his or its affairs, whether personally or by agents and servants, so to conduct them as not to injure another, except on the penalty of answering in damages. It is true that there are definitions of the first mentioned maxim which refer to it as applying only where the principal or master does derive or expects to derive a profit or some advantage to himself. Lord Chief Justice Best, in 1824, in Hall v. Smith et al., 2 Bingham's Reports 156, said:

"The maxim of respondeat superior is bottomed on this principle, that he who expects to derive advantage from an act

which is done by another for him, must answer for any injury which a third person may sustain from it."

The decision was correct and the definition and principle of law laid down was correct and proper as applied to the public official, a road commissioner, who was sought to be made liable for the negligence of a contractor employed to do the road work. The same definition has been quoted by many courts since. But the factor of profit or advantage to the master or principal is not essential to the application of the rule. Certainly if a person directs his servant to take the former's carriage or automobile either to perform a valuable service for him, or to take his neighbor's children for a pleasure trip, or to go on an errand of mercy or charity, that person is liable in damages to any person injured by the servant's negligence on any of those trips. The decisions disclose that the rule of respondeat superior is in full force even though the work is not being done for the purpose of profit. Bruce v. M. E. Church (110 N. W. 951), supra; Kellogg v. Church Charity Foundation, 128 App. Div. 214, 112 N. Y. S. 566; Basabo v. Salvation Army, 35 R. I. 22, 85 A. 120, 42 L. R. A. (N. S.) 1144.

As an offshoot of the trust fund doctrine is the theory that one who becomes a beneficiary of the charity does so on the implied assent or condition that the trust property is not available to him for compensation in the event of his injury through the negligence of the trustees or their servants. In other words he enters into a relationship with his benefactor which exempts the latter from such responsibility. He assumes the risk, in consideration of the gratuitous service rendered him. This has been named the "waiver theory". One of the earlier cases to announce this doctrine was Powers v. Massachusetts Homeopathic Hospital, 109 F. 294, supra. It has been followed in many decisions. Among them being Schloendorff v. Society of New York Hospital, 211 N. Y. 125, 105 N. E. 92, 52 L. R. A. (N. S.) 505, Ann. Cas, 1915C, 581; Cook v. John N. Norton Memorial Infirmary, 180 Ky. 331, 202 S. W. 874, L. R. A. 1918E 647; Thomas v. German General Benevolent Society, 168 Cal. 183, 141 P. 1186.

There is much to be said for the "waiver" theory particularly when the beneficiary, of his own free will, enters the institution, whether it be a hospital, school, or other charity con-

cern, and accepts the benefits, with knowledge of all the risks. But there has been rather caustic criticism where the rule has been applied to situations where a patient has been brought in unconscious, badly crippled, or the patient is a new born babe, or the patient because of his indigency, has no alternative than to accept the charity. It seems to the writer that negligent treatment is not charity even to a needy patient, and that when one with knowledge, skill and capacity holds himself out to give such service, and undertakes to do so, he is under obligation to render such proper service as the case demands, and his ability and facilities can give. Such a rule does not apply to a layman good Samaritan who does the best he can in an extreme urgency.

The best reasoned theory and the one now most generally accepted by those advocating the immunity, is that of public policy. In other words that it is better for the community and the public in general that the individual suffer and bear his loss, rather than that the offending charitable institution should suffer in damages.

In this case the appellee claims that since the deceased was not an employee of the defendant, nor paid by it, and was not a member of its association, and in no way a beneficiary of its charity, instruction, entertainment, or recreation, the defendant is not exempt from its responsibility in damages to the appellee, sustained by the negligence of its employees, simply because it is a charitable institution.

On the other hand, the appellant admits that the deceased was not its employee, in the sense that it hired him and paid him, but that he was its employee, in the common law sense, that it used him. It further contends that since it afforded him a place to work, and thus benefit himself, through the arrangement which the appellant made with the WPA that the deceased was also a beneficiary of the appellant. It also contends that whether the deceased was an employee or beneficiary of the appellant, or a stranger to it, that in any event, its immunity, by reason of its charitable character and work, exempts it from any responsibility in damages to the deceased or to his estate, because of any negligence on the part of any of its employees.

The appellant claims the right to this exemption and bottoms the existence of this immunity upon all of the above stated theories, advocated as the foundation for it, to wit: (1) The trust fund theory; (2) The nonapplicability of the rule

of respondeat superior to it; (3) The waiver theory; and (4) The public policy theory.

It is thus apparent that the question of the immunity of a public charity institution for its negligence,. in all of its relations, and in all of its phases, is before us.

The questions involved are not wholly res integra to this court. Since we have already held in Mikota, Admr. v. Sisters of Mercy and Mercy Hospital, 183 Iowa 1378, 168 N. W. 219, that an institution conducted solely for the doing of charity is not liable for the negligence .of its servants, to a patient receiving the benefits of that charity, even though he pays for it. See also Eighmy v. U. P. Ry., 93 Iowa 538, 61 N. W. 1056, 27 L. R. A. 296. But we have never before had presented to us the question of the liability of such an institution for the negligence of its servants or employees in causing injury to one who was a stranger to the institution or to its charity, or to one of its own employees or servants, or to one on its premises by its express or implied invitation, in other words, to one not benefiting from the charity.

The able and diligent lawyers on each side have been very helpful in the citation of numerous authorities and in the presentation of their contentions. We have also found an avowed friend of the court in the Iowa Hospital Association, who has favored us with a brief and argument in support of the appellant. We appreciate the friendship and the aid. This brief and argument is subscribed by one hundred and four hospitals in Iowa. Just how many of them operate for charity and how many for a profit to themselves is not disclosed. Only the former are eligible to the immunity claimed by the appellant.

We have read all of the authorities presented on each side, and many more. The questions are important and cover a broad field. This opinion is therefore much longer than we would otherwise desire.

II. Appellant has introduced evidence and has cited authorities in support of its position that it comes within the class of charitable institutions. It is our judgment that it does. Benevolence and charity do not always consist wholly of almsgiving, or the relief of the· wants of the needy, or helpless. It includes also the gratuitous or partly gratuitous improvement of spiritual, mental, social and physical conditions of young people, by the maintenance of courses of study, lectures, relig-

ious services, libraries, entertainments, gymnasiums, recreation grounds, and other kindred activities, by various institutions. Stiles v. Des Moines Council Boy Scouts, 209 Iowa 1235, 229 N. W. 841; Bruce v. Y. M. C. A., 51 Nev. 372, 277 P. 798; Eads v. Y. W. C. A., 325 Mo. 577, 29 S. W. 2d 701; Waldman v. Y. M. C. A., 227 Wis. 43, 277 N. W. 632; Bachman v. Y.W. C. A., 179 Wis. 178, 191 N. W. 751, 30 A. L. R. 448; Averback v. Y. M. C. A., 250 Ky. 34, 61 S. W. 2d 1066; Waddell v. Y. W. C. A., 133 Ohio St. 601, 15 N. E. 2d 140; Philadelphia v. Y. W. C. A., 125 Pa. 572, 17 A. 475; Betts v. Y. M. C. A., 83 Pa. Super, 545. The appellant has been, and is doing a highly commendable and admirable service.

██ III. The next question for determination is whether the deceased was a beneficiary of the charity, or of the benevolent aid of the appellant, as outlined above, and within its charter and work. For if he was such beneficiary, then that is an end of this case under the authority of the Mikota case, and of the majority of the authorities in this country. Many of these authorities are collected by commentators, authors and annotators, as set out in an extensive note in 14 A. L. R. 572, and in supplementary notes in 23 A. L. R. 923, 30 A. L. R. 455, 33 A. L. R. 1369, 42 A. L. R. 971, 62 A. L. R. 724, 109 A. L. R. 1199, and in 10 American Jurisprudence, section 134 et seq., 13 R. C. L. 944 et seq., 11 C. J. 374-379, Harper, Law of Torts, section 294 et seq.

We set out here only some of the later authorities in support of the principle of the nonliability of charitable institutions for the negligence of their servants, employees or agents to a beneficiary of its charity. Greatrex v. Evangelical Deaconess Hosp., 1933, 261 Mich. 327, 246 N. W. 137, 86 A. L. R. 487; Bardinelli v. Church of All Nations, 23 Cal. App. 2d 713, 73 P. 2d 1264; Messina v. Societe Francaise, La. App., 170 So. 801; D'Amato v. Orange Mem. Hosp., 101 N. J. L. 61, 127 A. 340; Johnson v. City Hosp., 196 N. C. 610, 146 S. E. 573; Walsh v. Sisters of Charity, 1933, 47 Ohio App. 228, 191 N. E. 791; Carver Chiropractic College v. Armstrong, 103 Okla. 123, 229 P. 641; Norfolk Protestant Hosp. v. Plunkett, 1934, 162 Va. 151, 173 S. E. 363; Ratliffe v. Wesley Hosp. & Nurses Training School, 135 Kan. 306, 10 P. 2d 859; Mitchell v. Executive Committee of Baptist Conv., 49 Ga. App. 615, 176 S. E. 669; Schumacher v. Deaconess Hosp., 218 Wis. 169, 260 N. W. 476; Wil-

cox v. Idaho Falls Latter Day Saints Hosp., Idaho, 82 P. 2d 849; Hamilton v. Corvallis Gen. Hosp., 146 Oregon 168, 30 P. 2d 9; Ettlinger v. Trustees of Randolf-Macon College, 4 Cir., 31 F. 2d 869; Bodenheimer v. Confederate Memorial Assn., 4 Cir., 68 F. 2d 507; Southern Methodist Hosp. v. Wilson, 45 Ariz. 507, 46 P. 2d 118; Id., Ariz., 77 P. 2d 458; Arkansas Midland R. Co. v. Pearson, 98 Ark. 399, 135 S. W. 917, 34 L. R. A. (N. S.) 317; Young v. Boy Scouts of America, 9 Cal. App. 2d 760, 51 P. 2d 191; Brown v. St. Luke's Hosp. Assn., 85 Colo. 167, 274 P. 740; Cashman v. Meriden Hosp., 117 Conn. 585, 169 A. 915; Plant System Relief & Hosp. Dept. v. Dickerson, 118 Ga. 647, 45 S. E. 483; Mater v. Silver Cross Hosp., 285 Ill. App. 437, 2 N. E. 2d 138; Parks v. Northwestern Univ., 218 Ill. 381, 75 N. E. 991, 2 L. R. A. (N. S.) 556, 4 Ann. Cas. 103; St. Vincents Hosp. v. Stine, 195 Ind. 350, 144 N. E. 537, 33 A. L. R. 1361; Old Folks & Orphan Children's Home v. Roberts, 83 Ind. App. 546, 149 N. E. 188; Averback v. Y. M. C. A., 250 Ky. 34, 61 S. W. 2d 1066; Jensen v. Maine Infirmary, 107 Me. 408, 78 A. 898, 33 L. R. A. (N. S.) 141; Conklin v. Industrial Home, 224 Mass. 222, 112 N. E. 606; Bruce v. Henry Ford Hosp., 254 Mich. 394, 236 N. W. 813; Mississippi Baptist Hosp. v. Moore, 156 Miss. 676, 126 So. 465, 67 A. L. R. 1116; Sibilia v. Paxton Hosp., 121 Neb. 860, 238 N. W. 751; Bruce v. Y. M. C. A., 51 Nev. 372, 277 P. 798; Boeckel v. Memorial Hosp , 108 N. J. L. 453, 158 A. 832; Hamburger v. Cornell Univ., 240 N. Y. 328, 148 N. E. 539, 42 A. L.R. 955; Waddell v. Y. W. C. A., 133 Ohio St. 601, 15 N. E. 2d 140; Lakeside Hosp. v. Kovar, 131 Ohio St. 333, 2 N. E. 2d 857; Betts v. Y. M. C. A., 83 Pa. Super. 545; Gable v. Sisters of St. Francis, 227 Pa. 254, 75 A. 1087, 136 Am. St. Rep. 879; Lindler v. Columbia Hosp., 98 S. C. 25, 81 S. E. 512; Abston v. Waldon Academy, 118 Tenn. 24, 102 S. W. 351, 11 L. R. A. (N. S.) 1179; Steele v. St. Josephs Hosp., Tex. Civ. App., 60 S. W. 2d 1083; Weston's Admx. v. Hospital of St. Vincent, 131 Va. 587, 107 S. E. 785, 23 A. L. R. 907; Bise v. St. Luke's Hosp., 181 Wash. 269, 43 P. 2d 4; Roberts v. General Hosp., 98 W. Va. 476, 127 S. E. 318, 42 A. L. R. 968; Waldman v. Y. M. C. A., 227 Wis. 43, 277 N. W. 632; Morrison v. Henke, 165 Wis. 166, 160 N. W. 173; Bishop Randall Hosp. v. Hartley, 24 Wyo. 408, 160 P. 385, Ann. Cas. 1918E. 1172.

Appellant claims that deceased was a beneficiary of its

benevolent work because he was at work in its building by reason of some arrangement which it had made with his superiors in the Works Progress Administration. Possibly the appellant in furnishing a place for the WPA to make effective its aid to the unemployed, indirectly benefited the deceased, but it seems to us that if appellant and the deceased were bound together in the relation of benefactor and beneficiary, it was by a filament so tenuous that we cannot see it. The deceased was in the appellant's building with its consent doing general repair work—mending and replacing defective parts—putting its building in better condition—all at no expense to the appellant. He was doing work that the appellant would, in time, if not then, be required to have done by some other carpenter or mechanic, whom it would hire and pay. It strikes us that the WPA and the deceased were the benefactors and the appellant, the beneficiary. The appellant has not brought itself, either in fact, or in law, within any of the authorities cited above or that we have read. Our judgment, therefore, is, that the deceased was not a beneficiary of the appellant.

IV. There is left the question of whether the deceased was a stranger to, an invitee of, or an employee of the appellant. There are authorities holding a charitable organization not liable for its negligence to persons in each of the above relations. We will refer to those authorities first. The appellant has cited and quoted from the following cases. Those in which the injured person was an employee: Eads v. Y. M. C. A., 325 Mo. 577, 29 S. W. 2d 701; Betts v. Y. M. C. A., 83 Pa. Super. 545; Whittaker v. St. Luke's Hosp., 137 Mo. App. 116, 117 S. W. 1189; Emery v. Jewish Hosp. Assn., 193 Ky. 400, 236 S. W. 577; Farrigan v. Pevear, 193 Mass. 147, 78 N. E. 855, 7 L. R. A. (N. S.) 481, 118 Am. St. Rep. 484, 8 Ann. Cas. 1109; Conklin v. Industrial Home, 224 Mass. 222, 112 N. E. 606; Zoulalian v. New England San., 230 Mass. 102, 119 N. E. 686, L. R. A. 1918F, 185; Thurston County Chapter, American Natl. Red Cross v. Dept. of Labor, 166 Wash. 488, 7 P. 2d 577.

Those in which the injured person was a stranger or invitee— Bachman v. Y. W. C. A., 179 Wis. 178, 191 N. W. 751, 30 A. L. R. 448; Foley v. Wesson Hosp., 246 Mass. 363, 141 N. E. 113; Fire Ins. Patrol v. Boyd, 120 Pa. 624, 15 A. 553, 1 L. R. A. 417, 6 Am. St. Rep. 745; Loeffler v. Sheppard & Enoch Pratt Hosp., 130 Md. 265, 100 A. 301, L. R. A. 1917D, 967; Webb v.

Vought, 127 Kan. 799, 275 P. 170; Vermillion v. Woman's College, 104 S. C. 197, 88 S. E. 649. In this category we also call attention to Hill v. President and Trustees of Tualatin Academy and Pacific University, 61 Oregon 190, 121 P. 901, where a four-year-old child visiting the school with its mother and sister was injured by a gun set to shoot gophers on the campus. The defendants were held not liable. Also the case of Jackson v. Atlanta Goodwill Industries, 46 Ga. App. 425, 167 S. E. 702, in which the defendant devoted the proceeds of commodities sold in its store to furnishing labor to needy persons, and also furnished commodities for charitable purposes. The court held it was a charitable institution. Plaintiff sought recovery for injuries to himself and automobile, caused by a collision with defendant's automobile being operated by it in its charitable work. Plaintiff was a third party and not a beneficiary. His action was dismissed and judgment affirmed. A writ of certiorari to the United States supreme court was denied, 290 U. S. 625, 54 S.Ct. 63, 78 L.Ed. 545.

In the Maryland case cited above, a city fireman was injured because of a defective fire escape on the hospital building. Recovery was denied. In the Kansas case the plaintiff, a stranger to the Salvation Army, was injured in a collision of his car with a motor truck operated by the defendant in its work. Judgment was for the defendant, but two justices dissented on the ground that all organizations and corporations stand on an equality before the law. In the South Carolina case one attending a musical entertainment given by the school in its auditorium was injured by a falling balcony. Judgment for nonsuit was affirmed. Justice Fraser dissented. In the Pennsylvania case, the defendant was organized to save lives and property in buildings contiguous to a fire. It was really an aid to the fire department in its governmental duties. Plaintiff was injured by a tarpaulin thrown upon him. Recovery was denied. In the Wisconsin case, a stranger was struck by a window screen falling from defendant's window. Justice Doerfler filed an able dissent to a judgment for defendant. In the Massachusetts case the plaintiff, a stranger, was struck by defendant's ambulance. Recovery was denied.

Most of the last above mentioned courts give effect to the immunity theory in all of its phases. The Wisconsin and Massachusetts courts apply the trust fund theory to its full ef-

fect, and hold the charity need not show itself free from negligence even in the selection of its servants and agents.

The following authorities cited by the appellee or found by the court, include cases wherein the party injured was either a stranger to, invitee or employee of the charitable institution. In all of them the holdings of the courts were for the contention of the appellee in this case.

In Bruce v. Central Methodist Episcopal Church, 1907, 147 Mich. 230, 236, 110 N. W. 951, 954, 10 L. R. A. (N. S.) 74, 11 Ann. Cas. 150, the plaintiff was a painter employed by a contractor to tint the ceiling of defendant's church. He was injured because of defective scaffolding erected by the defendant. Though the latter was held by the court to be a charitable institution, and this was urged as a defense, the court, after an exhaustive discussion of the authorities, rejected this contention, and said:

"I conclude from this reasoning that corporations administering a charitable trust, like all other corporations, are subject to the general laws of the land, and cannot, therefore, claim exemption from responsibility for the torts of their agents. * * * But I can see no ground upon which it may be held that the rights of those who are not beneficiaries of a trust can in any way be affected by the will of its founder. The rights of such persons are those created by general laws, and the duties of those administering the trust to respect those rights are also created by general laws. The doctrine that the will of an individual shall exempt either persons or property from the operation of general laws is inconsistent with the fundamental idea of government. It permits the will of the subject to nullify the will of the people."

In Gallon v. House of Good Shepherd, 1909, 158 Mich. 361, 122 N. W. 631, 34 L. R. A. (N. S.) 286, 133 Am. St. Rep. 387, the defendant, for unlawfully detaining the plaintiff, was held liable in damages to her.

The New York courts in several decisions have held charitable institutions liable in damages for torts committed against those, who were not beneficiaries of the charity. In Kellogg v. Church Charity Foundation, 1911, 203 N. Y. 191, 96 N. E. 406, 407, 38 L. R. A. (N. S.) 481, Ann. Cas. 1913A, 883, the defendant was held liable to the plaintiff, a bicyclist on the street, in-

jured by the negligence of its ambulance driver. The court saying:

"The defendant contended originally that, even if the driver were in its employ his negligence could not be imputed to a purely charitable corporation, and it prevailed on this ground on the first trial. This view, however, was rejected by the appellate division (Kellogg v. Church Charity Foundation, 128 App. Div. 214 [112 N. Y. S. 566]) ; and it must now be regarded as settled that a charitable corporation is not exempt from liability for a tort against a stranger because of the fact that it holds its property in trust to be applied to purposes of charity."

In Hordern v. Salvation Army, 1910, 199 N. Y. 233, 92 N. E. 626, 628, 32 L. R. A. (N. S.) 62, 139 Am. St. Rep. 893, the plaintiff, a journeyman mechanic, while making repairs on defendant's boiler, was injured on a defective runway. In allowing recovery, the court after quoting the foregoing excerpt from Bruce v. M. E. Church, 147 Mich. 236, 110 N. W. 951, supra, said: "We can add nothing to the force of this reasoning, but simply express our concurrence therein."

In Murtha v. New York Homeopathic Med. Col. and Flower Hosp., 1920, 228 N. Y. 183, 126 N. E. 722, the plaintiff, while riding a taxicab was run down by defendant's ambulance. In granting recovery, Justice Cardozo said: "The rule is now settled that a hospital, though public, is 'liable to strangers, i. e., to persons other than patients, for the torts of its employees committed within the line of their employment.' Schloendorff v. New York Hosp., 211 N. Y. 125, 129, 105 N. E. 92, 93, 52 L. R. A. (N. S.) 505, Ann. Cas. 1915C 581. * * * One traveler run down through the negligence of another is not concerned to inquire whether the offender has gone forth on the highway for the love of man or of money."

In Johnsen v. Staten Island Hospital, 1936, 246 App. Div. 638, 283 N. Y. S. 664; Id., 271 N. Y. 519, 2 N. E. 2d 674, recovery was allowed plaintiff who slipped on a soapy linoleum, while visiting a patient at the defendant hospital.

In Grawunder v. Beth Israel Hospital Assn., 1934, 242 App. Div. 56, 272 N. Y. S. 171, a widow was permitted to recover for an unauthorized autopsy on her husband's body. In Gartland v. N. Y. Zoological Society, 135 App. Div. 163, 120 N. Y. S. 24,

the plaintiff, the servant of an independent contractor, was injured while fitting steampipes in defendant's building. Recovery was allowed.

In fact the New York court of appeals seems definitely to have abandoned its former holdings of nonliability for the negligence of a charitable institution to an injured beneficiary. In Sheehan v. North Country Community Hospital, March 9, 1937, 273 N. Y. 163, 7 N. E. 2d 28, 29, 109 A. L. R. 1197, that court said:

"Plaintiff, who had been a paying patient in a hospital of the defendant-appellant, a charitable corporation, was being removed in its ambulance to her home. Negligence of the driver brought the ambulance into collision with another vehicle and the plaintiff suffered injuries for which she had a judgment which has been affirmed. On these facts there is squarely presented for the first time in this court the question whether a charitable institution (not itself in default in the performance of any nondelegable duty) should be declared exempt from liability to a beneficiary for personal harm caused by the negligence of one acting as its mere servant or employee. Cf. Schloendorff v. Society of New York Hospital, 211 N. Y. 125, 105 N. E. 92, 52 L. R. A. (N. S.) 505, Ann. Cas. 1915C, 581.

"The case for immunity must rest on the hypothesis that a recipient of the benefit impliedly waives any claim for damages resulting from torts in the administration of a charity, a theory that would be inapplicable were the plaintiff a stranger to this hospital. See Hordern v. Salvation Army, 199 N. Y. 233, 238-240, 92 N. E. 626, 32 L. R. A. (N. S.) 62, 139 Am. St. Rep. 889; Hamburger v. Cornell University, 240 N. Y. 328, 329-340, 148 N. E. 539, 42 A. L. R. 955; Johnsen v. Staten Island Hospital Inc., 271 N. Y. 519, 2 N. E. (2d) 674; Kellogg v. Church Charity Foundation, 128 App. Div. 214, 218, 112 N. Y. S. 566. A prop may be found in the consideration that to compel payment of damages to a beneficiary would be to limit charitable activities and to dry up the sources of charitable donations. In a case not quite the same, the strongest argument for nonliability was stated in these words: 'There can certainly be no principle of natural justice which would require one engaged in charitable work to be liable to the recipients of his charity

for the wrongs of others. If he use reasonable care in the selection of the means and is guilty of no wrong himself, he ought not to be answerable to those who accept the charity for the wrongs of servants whom he has to employ to make it effecttive.' Wallace v. John A. Casey Co., 132 App. Div. 35, 44, 116 N. Y. S. 394, 401.

"On the other side it is answered that the 'waiver' doctrine is pretty much a fiction (Phillips v. Buffalo General Hospital, 239 N. Y. 188, 146 N. E. 199); *that to impose liability is to beget careful management; and that no conception of justice demands that an exception to the rule of respondeat superior be made in favor of the resources of a charity and against the person of a beneficiary injured by the tort of a mere servant or employee functioning in that character. It is our judgment that the greater weights are in this scale.* [Italics ours.]

"Moreover, the now declared public policy of the State is that persons damaged by the torts of those acting as its officers and employees need not contribute their losses to the purposes of government. Court of Claims Act, Sec. 12-a. We think it would not be a harmonious policy that would require this plaintiff to put up with her injuries on the score that the appellant is a charitable corporation. Cf. Murtha v. New York Homeopathic Medical College & Flower Hospital, 228 N. Y. 183, 126 N. E. 722."

In Thomas v. German General Benevolent Society, 1914, 168 Cal. 183, 141 P. 1186, the plaintiff was a chef in defendant's employ. Recovery was denied because the proximate cause of his injury was the intervening negligence of a fellow servant. The court, however, announced that the rule of immunity to a charitable institution for the negligence of its servants applied only to an injured beneficiary of its charity, and not to one of its own servants. In Phoenix Assurance Co. v. Salvation Army, 1927, 83 Cal. App. 455, 256 P. 1106, the defendant was held liable to a stranger to it, who was injured by the negligence of its automobile driver, while driving about in its religious and charity work.

The Connecticut court, in Cohen v. General Hospital Soc., 1931, 113 Conn. 188, 154 A. 435, 437, held that the eleemosynary character of the defendant did not afford it immunity from

liability to an invitee, for the tortious acts of its servants. In holding for the plaintiff, the court, in an able opinion, said:

"If it be concluded, as we think it must, that the enforcement of the individual's right to recover from a charitable corporation for its tortious acts will not deprive the public of the benefits of such institutions, we fail to see upon what ground it can be said that public policy requires that a charitable corporation should be granted absolute immunity from tort liability. It is a corporation, capable of suing and being sued, and liable upon its contracts as any other person, corporate or individual. That its funds have been dedicated to charity does not place it beyond the law. The will of the donor or donors of the funds of the institution does not exempt them from the operation of the general laws of the land. A charity should not be permitted to inflict injury upon some without the right of redress, in order to bestow charity upon others. The result would be to compel the injured person to contribute to the charity against his will. Per contra, the modern tendency of the law is to shift the burden from the innocent victim to the community at large. The possibility, suggested in defendant's brief, that a fire or explosion, or similar catastrophe, resulting from negligence of the employees of a charitable institution such as the defendant, might result in judgments for damages so huge as to cripple its work and deprive future generations of its benefits, can of course be provided against by insurance covering such contingency.

"Whether or not, and to what extent, a charitable corporation is liable in tort for its negligence, or that of its servants and agents, is a question that has been frequently before the courts. It has been said that 'the cases on this subject present an almost hopelessly tangled mass of reason and unreason such as is not often encountered in the law.' Zollman, American Law of Charities, Sec. 813. * * *

"The plaintiff was not a patient of the hospital, but was at most an invitee when he went to the hospital for his wife who had been a patient. The fact that he had agreed to pay and did pay for her care and treatment at less than its cost to the defendant did not place him in the same legal situation as his wife had she been the plaintiff. The defendant owed him

the duty which any landowner owes to an invitee who comes upon his premises."

In Cashman v. Meriden Hosp., 1933, 117 Conn. 585, 169 A. 915, the court reaffirmed its holding in the Cohen case. There is dictum and language supporting the rule of liability as to nonbeneficiaries in Hearns v. Waterbury Hosp., 66 Conn. 98, 33 A. 595, 31 L. R. A. 224. In Boardman v. Burlingame, Hartford Retreat et al., 1938, 123 Conn. 646, 197 A. 761, judgment for the plaintiff for unlawful commitment was reversed and sent back for new trial, but there was no holding that defendants were not liable as a matter of law.

In Winona Technical Institute v. Stolte, 1909, 173 Ind. 39, 89 N. E. 393, 396, the plaintiff, a plumber's helper, working for a contractor, engaged in repairing the boilers of the institute, was engaged in cleaning a boiler, when an employee of the institute negligently turned steam into the boiler. The charitable character of the institution was questioned. In holding for Stolte that the defendant was liable regardless of its charitable character, the court said:

"We pass, however, without deciding, the question raised in regard to appellant's being a charitable institution, for under the facts it is not material. As shown, appellee was sent by his employer, the firm of Woolen & Callon, to assist in repairing the boiler in question. He was on appellant's premises by reason of its express invitation, made to him through his employer. Appellant in its corporate entity or capacity was the owner of the boiler which it desired repaired. It, through its agents, directed the repairs to be made. Having invited appellee upon its premises to make the repairs, it, in its corporate capacity, owed him the duty while he was so engaged to exercise reasonable care not to injure him. This duty it delegated to its servants, Corey and Fulton, in charge of the engine and boiler. This duty these servants failed to perform. Appellant could not delegate the duty, and thereby escape liability for damages resulting from the breach thereof. This proposition is well affirmed by the authorities."

As further confirmation of this attitude on the question, the same court in St. Vincent's Hosp. v. Stine, 1924, 195 Ind. 350, 144 N. E. 537, 542, 33 A. L. R. 1361, by way of obiter

stated that while the immunity was in effect as to beneficiaries of the charity, "this exemption from liability does not extend to outsiders or third persons."

In Louisiana, whose laws are based in large part upon the Civil Law, its court of appeal, in Bougon v. Volunteers of America, 1934, 151 So. 797, 799, directed judgment for the plaintiff who had been knocked down in the street by the negligent operation of a motor truck, driven by an employee in the charitable work of the defendant. The court said: "But there is no case in Louisiana which has extended the doctrine of the Jordan case [Jordan v. Touro Infirmary, La. App., 123 So. 726], so as to grant immunity to charitable corporations for the torts of their employees causing injuries to third persons, and, while there are a number of other jurisdictions in which the 'Trust Fund Doctrine' has been so extended, the clear weight of authority elsewhere is to the contrary. * * * 5 R. C. L. pp. 377, 379."

In Unser v. Baptist Rescue Mission, 1934, 157 So. 298, the Louisiana court of appeal followed the decision in the Bougon case.

In New Jersey, the court of common pleas, in Daniels v. Rahway Hospital et al., 1932, 160 A. 644, 10 N. J. Misc. 585, after stating that the liability of a charitable institution for its negligence to a stranger had "never been squarely decided by any reported case in this state", held that such a defense was not available as against a stranger injured by the negligence of the operator of defendant's ambulance on the highway. The New Jersey court had previously held the immunity effective as against a patient in a hospital and against the visiting mother of a patient. Boeckel v. Orange Memorial Hosp., 108 N. J. L. 453, 158 A 832, 833. The holding in the latter case that the mother was a beneficiary of the charity seems somewhat far-fetched.

The highest court of New Jersey, in Simmons et al. v. Wiley Methodist Episcopal Church et al, 1934, 112 N. J. L. 129, 170 A. 237, 238, judgment for a defendant, struck by a negligently operated automobile of the church, was affirmed. The court, speaking through Justice Trenchard, (eleven Justices concurring and five dissenting), said:

"Now it is quite within reason to declare that public policy forbids a charitable institution being held constantly to the

danger of damages for untoward results in some of the continuous ministrations to the direct beneficiaries of its charitable contributions; but such a rule is not invoked with equal justice, nor indeed by virtue of any public requirement, in the case of tortious injuries to those outside of its benefits, neither seeking nor receiving the same. It may well be sound public policy to avoid a diversion of trust funds from the direct object of their charitable donor by forbidding their application to damages for the negligence of the charity's servants where the injured party participates in the charity's bounty, but no charitable organization, no matter how lofty in character the motive or purpose, should be permitted with impunity to set up and operate machinery and thereby injure by negligence those unconcerned in and unrelated to that which the donor brought into being or supports in operation. To hold otherwise would be to acquiesce in the careless selection of servants, and in the carelessness of those selected, in the operation of automobile trucks on the public highway to the injury of entire strangers to the charity, a proposition repugnant to one's sense of justice.''

The same court in Kolb v. Monmouth Memorial Hospital, 1936, 116 N. J. L. 118, 182 A. 822, with the entire court of thirteen concurring, affirmed a judgment for the plaintiff, a volunteer fireman, who was injured in carrying a patient (a stranger to him) on a stretcher into the defendant hospital. The court said:

''The great majority of courts, however, do justice to employees, strangers and invitees by holding the charity to the same degree of care exacted from other entities. * * *

''In our state we have adopted and followed what we believe to be the majority view; i. e., the public policy theory. Thus we deny the right of recovery on the part of those who have a valid claim against a charitable institution, based on actionable negligence, but who are either the recipients of the benefactions or the beneficiaries of the charitable institution sought to be held liable; but we permit the right of recovery against charitable institutions, for their actionable negligence, on the part of 'those unconcerned in and unrelated to that which the donor brought into being or supports in operation.' * * *

''It obviously, therefore, becomes necessary to recur to the question of the relation of the plaintiff to the hospital at the

time of the accident. What was his status? It is clear that he was not personally the recipient of the benefactions of the hospital. Was he, however, a beneficiary of its benefactions, or was he 'unconcerned in and unrelated to' the hospital and its operation? A beneficiary is defined as 'the recipient of another's bounty; one who received a benefit or advantage.' 7 C. J. 1133, 1134.''

The North Carolina supreme court, in Cowans v. North Carolina Baptist Hospitals, 1929, 197 N. C. 41, 147 S. E. 672, in affirming a judgment for a servant of the defendant injured through its negligence, said:

''The chief question presented by the appeal is whether a charitable hospital, operated not for gain, but for benevolent purposes, can be held liable in damages for the negligent injury to a servant or employee. We think so. * * *

''Plaintiff was a servant or employee of the defendant, and not a beneficiary of its charity.''

The supreme court of Ohio, in Sisters of Charity of Cincinnati v. Duvelius, 1930, 123 Ohio St. 52, 173 N. E. 737, 739, reversed a judgment for the Sisters of Charity, and held that they were liable to the plaintiff, who was a special nurse to a patient, and not their employee, for injuries received by her through the negligence of their elevator operator. Chief Justice Marshall speaking for the court, said:

''Having reached the conclusion that the fund is not exempt, it only remains to discuss the third legal proposition, whether there can be a recovery, at the suit of one other than a patient receiving treatment in a hospital, for damages caused by the negligence of a servant. It is due to considerations of public policy that a patient in a charity hospital is held to have assumed the risks of the service, but it does not follow that the same considerations of public policy preclude a stranger from recovering compensation for damages caused by the negligence of a servant. Fully recognizing the soundness of the policy of partial exemption, there are other considerations of public policy which are equally important. No valid reason is apparent for granting immunity to a charitable institution for the negligence of its servants, and for placing the entire responsibility of an injury upon innocent third persons and their families.

Charitable institutions are frequently conducted upon a large scale, with all modern conveniences and appliances of a highly complicated nature, which enormously increase the risk of injury to operatives and strangers, and any doctrine of complete exemption would lead to carelessness, neglect, and injury to both person and property. While such institutions should be encouraged, and those who are charitably inclined should likewise be encouraged to support them, this encouragement must not be carried to the point where injustice will be done to others. Innocent persons should not suffer through another's fault. It is believed that the duty to exercise care to prevent injury to strangers will result in the exercise of greater care to patients, and the converse of this proposition is equally true that any encouragement to negligence toward strangers will inevitably be reflected to service rendered to beneficiaries of the charity. * * *

"In the view we have taken of the case, it is not necessary to determine whether or not there was any evidence tending to show a want of care in the selection of the servant who operated the elevator. We are in accord with the numerous cases which treat charitable institutions on the same basis as other corporations and individuals as to liability for negligence to strangers and invitees who are lawfully upon the premises of the institution."

The court of appeals of Lucas county, Ohio, in Pflugfelder v. Convent of the Good Shepherd, 1936, 55 Ohio App. 158, 9 N. E. 2d 4, held the defendant liable to plaintiff for injuries received by him in a collision between his automobile and a bull of the defendant, trespassing on the highway.

The court of civil appeals of Texas, in Armendarez v. Hotel Dieu, 1912, 145 S. W. 1030, 1031, after holding that the defendant was a charitable religious corporation, reversed a judgment on a directed verdict for the defendant, against one of its employees, injured through its negligence, and said:

"The question we have to decide is whether or not the law of master and servant, as it prevails in this state, is to be applied to the defendant, in view of its character as a charitable institution. The defendant is a creature of the state, which has permitted it to incorporate for the purpose desired by it under a statute which vested it with capacity to sue and be sued. An object of the incorporation was to carry on a busi-

ness, in order that the institution might obtain funds, to enable it at the same time to accomplish its charitable work. In order to conduct its business, it naturally was proper and necessary for it to have employees, and to thus assume the relation of master and servant, which it did by employing this plaintiff. The law of master and servant, involving the duties it imposes on the master and his liability for injuries resulting from the nonobservance of such duties, permeates and reaches every situation in the affairs of men in which that relation is assumed. This defendant, it appears from the evidence, conducted its affairs for the combined purposes of revenue and charity; the former being, in the religious aims of the members, subordinated to the latter as the ultimate object. But independently of this, had this corporation derived no revenues from its operations, and the funds which enabled it to carry on its benefactions were derived, not from its beneficiaries, but from endowments or contributions, it would not in our opinion make a particle of difference in its attitude to the law with reference to its legal duties and liabilities to persons in its service as employes. It was an incorporated body, chartered by its own volition, endowed with power to employ servants, and with the capacity to sue and to be sued. It was not in any sense an agency of the state, nor has the Legislature seen fit to extend to such corporations exemption from the well-known duties and liabilities imposed by the general law governing master and servant. This being so, defendant would be liable for injury sustained by its employe due to the negligence, if any, of itself, its managing officers, or agents or vice principals, which is the case presented here.''

The supreme court of appeals of Virginia, in Hospital of St. Vincent of Paul v. Thompson, 1914, 116 Va. 101, 81 S. E. 13, 18, 51 L. R. A. (N. S.) 1025, after an extensive review of the authorities, in affirming a judgment for the plaintiff, who, merely as a friend, accompanied a patient to the hospital, and was injured in an unprotected elevator shaft, said:

''Applying the principles considered to the case before us, it becomes at once apparent that the defendant in error was not a beneficiary of the charity, but that she is to be considered as a stranger, and comes within the influence of the principle that a charitable corporation is not exempt from liability for torts

against strangers because it holds its property in trust to be applied to the purposes of charity; a principle which seems to be fully established by courts of the highest authority and in well-considered cases.''

In Trevett v. Prison Association of Virginia, 1900, 98 Va. 332, 36 S. E. 373, 50 L. R. A. 564, 81 Am. St. Rep. 727, judgment on a demurrer to the complaint was reversed, and the court held that the defendant, though a benevolent charitable corporation, was subject to liability in damages for the pollution of a stream flowing through the plaintiff's premises. See, also, Weston's Admx. v. Hospital of St. Vincent of Paul, 1921, 131 Va. 587, 107 S. E. 785, 23 A. L. R. 907, for supporting dicta.

The Tennessee supreme court, in McLeod v. St. Thomas Hospital, 1936, 170 Tenn. 423, 95 S. W. 2d 917, 918, reversed a judgment for defendant, and remanded the case for trial, in which the plaintiff, while visiting her husband, who was a paying patient in the hospital, fell and injured herself on a slippery floor. The court said:

''The rule of exemption of such institution is by no means of universal application. * * *

''This rule, while followed to some extent, is severely criticized in Love v. Nashville Agricultural and Normal Institute, 146 Tenn. 550, 243 S. W. 304, 23 A. L. R. 887. That opinion points out also that the rule, if carried to its logical conclusion, would permit of no exception. It is there observed also that the weight of authority is that the doctrine does not apply in case of liability to a stranger to the trust, and it is said that all our cases, where liability has been denied, were cases where damages resulted to a beneficiary of the trust. The Love Case does make an exception to the rule, and permitted a recovery against a charitable institution for a nuisance—the pollution of a spring. * * *

''Upon consideration of the cases dealing with the question, and reflecting upon the true principle involved, we think it fairly may be said that the exemption and protection afforded to a charitable institution is not immunity from suit, not nonliability for a tort, but that the protection actually given is to the trust funds themselves. It is a recognition that such funds cannot be seized upon by execution, nor appropriated to the satisfaction of a tort liability. And certainly it is no defense

to a tort action, that the defendant has no property subject to execution.

"It must be true, as a general rule, that those who enter the grounds and premises of charitable institutions have no special knowledge that such institutions are not liable for dangerous conditions therein or thereupon existing. We all know that many of such institutions acquire very extensive properties, and that their activities cover a wide field; the patients admitted thereto, who pay for services, pay full fees, and to all intents and purposes they are competing with private institutions of like character. They touch the public in many respects, and under present conditions, it does not seem fair to say that such institutions shall be absolutely exempt from suit for injuries sustained by one who is not a beneficiary of the trust, but who is injured through the wrong of the institution."

In Marble v. Nicholas Senn Hospital Assn., 1918, 102 Neb. 343, 167 N. W. 208, that court affirmed a judgment for the plaintiff, a doctor, who in going with a patient, a little girl, to obtain a radiograph of her head, was injured through the hospital's negligence. The court said:

"In a recent article on Hospitals it was said: 'The theories of the immunity of a hospital from liability on the ground of public policy and on the ground that the assets are a trust fund having been very generally rejected by the courts, and the doctrine of waiver by acceptance of benefits being applicable only to patients, the law has come to be that as to others not the recipient of the institution's charity the rule of responsibility for the negligence of its servants and agents is applied as in cases of the ordinary business corporation.' 13 R. C. L. 948, sec. 12.

"This view of the law conforms to correct standards of justice, and defeats the immunity pleaded in the answer of defendant."

The same court in Wright v. Salvation Army, 1933, 125 Neb. 216, 249 N. W. 549, 550, held that the defendant, for its negligence, was subject to liability to the plaintiff, a rug weaver, who went to defendant's place of business to purchase old clothing to be used in weaving. Though unsuccessful in the action, because of his contributory negligence, the court said:

"It is argued that the defendant, being an eleemosynary corporation, is not liable to the plaintiff, but the evidence shows that the plaintiff was not a recipient of the institution's charity but was dealing with the defendant for gain, and therefore the defendant was responsible for the negligence of its servants and agents as in cases of the ordinary business corporation. 13 R. C. L. 948, Sec. 12."

The court of Minnesota subjects charitable institutions to the same liability as all other individuals, copartnerships and corporations, caused by their negligence. In Geiger v. Simpson Methodist-Episcopal Church of Minneapolis, 174 Minn. 389, 219 N. W. 463, 465, 62 A. L. R. 716, the plaintiff, a minor official of and teacher in the church, while taking part in a social meeting in the basement of the church, was injured by a piano which tipped over on him, because of a broken caster. In affirming a judgment for plaintiff, the court, after stating that the church, although a charitable organization, and the plaintiff was a beneficiary thereof, was nevertheless liable, said:

"We find no valid reason for departing from the rule of the Mulliner Case [Mulliner v. German Evangelical Synod, 144 Minn. 392, 175 N. W. 699]. It is a trite saying that charity begins at home. It may reasonably be said that charitable institutions must first fairly compensate those who are injured and damaged by the negligence of their officers and servants in the conduct of the affairs of such institutions before going farther afield to dispense charity and do good. Men and corporations alike are required to be just before being charitable. Charitable, benevolent, and religious institutions have been and are doing immeasurable service for the physical and moral welfare of humanity. Such institutions are rapidly growing in number, in resources, and influence. They should be encouraged, aided, and protected in carrying on their work to the full extent that it may be done without injustice to others. They are generally favored by being relieved, partly or wholly, from the burden of taxation. We do not think it would be good public policy to relieve them from liability for torts or negligence. Where innocent persons suffer through their fault, they should not be exempted. That rule, in the long run, will tend to increased efficiency and benefit them and the public, as well as persons so injured. It is almost contradictory to

hold that an institution organized to dispense charity shall be charitable and extend aid to others, but shall not compensate or aid those injured by it in carrying on its activities.

"No question of diversion of trust funds is presented in this case. In any event, that theory has been so weakened and limited by the decisions that it is not likely to hereafter have much practical application or importance."

The Mulliner case, referred to in the Geiger case, is entitled Mulliner v. Evangelischer Diakonniessenverein of Minnesota Dist. of German Evangelical Synod of America, 1920, 144 Minn. 392, 175 N. W. 699, 701. Plaintiff's intestate while a typhoid patient of the defendant, in a delirium, jumped through the window of his room and was killed. In affirming a judgment based on defendant's negligence, the court said:

"Another reason urged is that such corporations do not come within the main purpose of the rule of public policy which supports the doctrine of respondeat superior because they derive no gain from the service rendered. This contention does not seem to us a just one. This corporation must administer its functions through agents as any other corporation does. It harms and benefits third parties exactly as they are harmed or benefited by others. To the person injured the loss is the same as though the injury had been sustained in a private hospital for gain. In this case, the deceased paid for the services he expected would be rendered, but this may not be a controlling fact. We do not believe that a policy of irresponsibility best subserves the beneficent purposes for which the hospital is maintained. We do not approve the public policy, which would require the widow and children of deceased rather then the corporation, to suffer the loss incurred through the fault of the corporation's employees, or, in other words, which would compel the persons damaged to contribute the amount of their loss to the purposes of even the most worthy corporation. We are of the opinion that public policy does not favor exemption from liability."

In McInerny v. St. Luke's Hospital Assn., 122 Minn. 10, 141 N. W. 837, 46 L. R. A. (N. S.) 549, the plaintiff, a laundress, in defendant's employ was injured in using an unprotected mangle. In affirming a judgment for her, the court said:

"In reaching this conclusion we are not to be understood as underestimating, or failing to appreciate to its fullest extent, the blessings bestowed upon the destitute, and the poverty-burdened applicant for help. Our view is that the duty created by law for the protection of servants is absolute, and no employer should be exempt therefrom, except by action of the legislature. No public good can come from permitting one charitable corporation, by the failure of a duty imposed by law, to maim and disfigure its servants and employees, when, depending upon the nature of the injury, their future welfare must of necessity be looked after by some other charitable association, public or private, or by already overburdened or poverty-stricken relatives and friends. No such situation should be brought about by an arbitrary rule of immunity from liability, applicable only to one class of persons, unless deemed by the legislature necessary to the existence and life of charitable associations."

The South Carolina court, in Peden v. Furman University, 1930, 155 S. C. 1, 151 S. E. 907, though recognizing the defendant to be within the class of eleemosynary and charitable institutions, held it was subject to injunction and damages from so using its athletic field, as to become a nuisance, and injury to plaintiff's property.

In Hewett v. Woman's Hospital Aid Association, 1906, 73 N. H. 556, 64 A. 190, 7 L. R. A. (N. S.) 496, after a review of the English and American cases up to that time, sustained a judgment for the plaintiff, a student nurse, under contract with the hospital for training as a nurse and additional compensation to her of $10 a month, because she was negligently put in charge of a diphtheria patient without warning, and from whom she contracted the disease.

The Rhode Island court in Glavin v. Rhode Island Hospital, 1879, 12 R. I. 411, 34 Am. Rep. 675, was the pioneer court in this country in holding a public charity hospital responsible in damages to a patient for the negligence of one of its employees. In this case the negligent person, although he was a surgical interne, performed other duties of such nature that the court regarded him as an employee of the hospital. The court held that there would be no such relation between the hospital and an attending physician or surgeon, even though they might

be classed as house-doctors, and that as to them the hospital owed no duty to its patients, other than to exercise reasonable care in the selection of the doctors. In a concurring opinion, Justice Potter, in speaking of the immunity in question, said:

"Is it not better and safer for the court to follow out the analogies of the law, and then if the legislature is of opinion that public policy demands a limitation of this liability, it is in its power to interfere and grant an entire or partial exemption."

The legislature promptly and apparently, with a vengeance, took the court at its word and immunized charitable hospitals incorporated by the general assembly for the neglect or *malicious* acts of any of its officers, agents, or employees in the management of, or for the care or treatment of any of the patients or inmates of the hospital. Sec. 95, Chap. 248, Gen. Laws of Rhode Island 1923. (Italics ours.) The Glavin case has been praised and criticized in this country, but its conception of the liability of a hospital, the doctors and nurses therein, in the care of patients, has received the high praise of the English and Colonial courts. Hillyer v. Governors of St. Bartholomew Hosp., 2 Kings Bench 820; Donaldson v. The Commissioners of the General Public Hosp., Supreme Court, 30 New Brunswick Reports 279; District of Auckland and Charitable Aid Board, 1892, 10 New Zealand Reports 597; Thompson v. Columbia Coast Mission and Tidey, British Columbia, 1914, 26 Western Law Reporter 861; Lavere v. Smith's Falls Public Hospital, 35 Ontario Law Rep. 98; Hall v. Lees, 1904, 2 Kings Bench 602. The principle of such liability was also adopted and praised by Justice Cardozo, in Schloendorff v. Society of N. Y. Hosp., 211 N. Y. 125, 105 N. E. 92, 52 L. R. A. (N. S.) 505, Ann. Cas. 1915C, 581.

In Basabo v. Salvation Army, 1912, 35 R. I. 22, 85 A. 120, 129, 42 L. R. A. (N. S.) 1144, the court in a very exhaustive and much quoted opinion, in a case certified to it for the determination of the very legal question involved in the case at bar, held that the defendant was liable in damages for the death of a bicyclist run over by the horse and wagon of the defendant in the performance of its charitable work. The court said:

"In view of the principles above set forth, this court is of

the opinion that both upon reason and upon authority, so far as the cases directly apply to the case at bar, the defendant corporation, although it is a charitable corporation, is liable, as any other corporation, for injuries to third persons caused by the negligence of its servants and agents in the care and management of its horses and teams while employed for its purposes, even though it is not shown or alleged that there has been any lack of care or diligence on the part of the defendant in the selection or retention of such servants or agents. We believe that public policy does not require any such exemption from liability as is claimed by the defendant in this case, but, on the contrary, that such exemption would be contrary to true public policy. We are clearly of the opinion that the true legal relation of master and servant existed between the defendant and the drivers in its employ at the time of the alleged injury, and that, just as such a servant has a lawful right to recover his stipulated wages for his services and to recover damages for breach of his contract of service on the part of his master, so, also, would he be entitled to recover for injuries due to the negligence of his master as in other cases of master and servant, and so, also, would his master be liable for his torts and negligence while in the service of the master as in any other case. It would, in our opinion, be manifestly unjust and contrary to public policy to hold that a person run over and injured on a public highway by a horse and wagon belonging to the defendant and driven by the defendant's servant, through the negligent acts of such servant, would not be entitled to recover against the master, but could only recover against the negligent servant, while a person injured under similar circumstances by the servant of an expressman, or the driver of a cab belonging to a liveryman, would be allowed to recover against the master. There is no reason or logic in the attempted distinction between the servant of the defendant and the servant of any other person or corporation. We answer the question submitted to this court in the affirmative."

The circuit court of appeals for the 2d circuit, a very able court, consisting of Judges Learned Hand, Thomas W. Swan, and Augustus N. Hand, passed upon a charitable institution's liability to a stranger to the charity, in Henry W. Putnam Memorial Hospital v. Allen, 1929, 34 F. 2d 927, 929, in which

case plaintiff while driving an automobile was injured in a collision with the negligently driven ambulance of the hospital. In affirming a judgment for the plaintiff below, the court, through Justice Swan, said:

"The court's ruling as to the liability of the hospital also involves a question of local law upon which the authorities are divided. Both parties agree that there is no controlling Vermont decision, so that we must determine for ourselves what rule to apply. Whatever may be the correct doctrine where the injured plaintiff is a recipient of the bounty of an eleemosynary institution, as, for example, a patient at a hospital (Powers v. Massachusetts Homoeopathic Hospital, 109 F. 294 [65 L. R. A. 372], (C. C. A. 1), or a student at a university (Parks v. Northwestern University, 218 Ill. 381, 75 N. E. 991, 2 L. R. A. (N. S.) 556, 4 Ann. Cas. 103), we have no difficulty in deciding that irresponsibility should not be extended to the tortious infliction of damage upon strangers. To hold that a charitable institution, whose agent negligently runs down a pedestrian upon the street, need not respond in damages, although the circumstances are such as would render any other defendant liable, seems to us a monstrous doctrine.

"It is true that several courts of high authority have gone to this extreme. * * * But in our opinion no adequate reason has been, or can be, advanced for allowing the purpose of the settlor of trust funds to introduce into the law a principle which, to us, appears so anomalous and so unjust. We prefer the reasoning of cases which have applied the ordinary rules of liability to such a situation as is now before the court."

In Alabama Baptist Hospital Board v. Carter, 1933, 226 Ala. 109, 145 So. 443, the court in remanding the case for new trial, held that the plaintiff who was visiting her sick husband in the defendant hospital was not barred, as a matter of law, from recovering for its negligence, either as a stranger, invitee, or beneficiary, and that evidence as to the charitable character of the hospital was properly rejected as immaterial, on the authority of Tucker v. Mobile Infirmary Assn., 1915, 191 Ala. 572, 68 So. 4, 56 L. R. A. (N. S.) 1167, wherein the court, in a masterly opinion by Justice Gardner, learnedly discusses the English and American authorities. Judgment was allowed a pay patient for the hospital's negligence. Justice Riddell of the

Ontario supreme court, in Lavere v. Smith's Falls Public Hosp., supra, speaks of the decision as one of "masculine common sense." In Supreme Lodge of Loyal Order of Moose v. Kenny, 1916, 198 Ala. 332, 73 So. 519, L. R. A. 1917C, 469, recovery was allowed for the negligent injury to an initiate to the lodge.

From the foregoing statement it will be noted that the courts of eighteen states—the highest court in almost all of them —and one United States circuit court, have unequivocally held that no corporation or other institution, because of its charitable or nonprofit character, is exempt from responsibility to its servants and employees, or to invitees upon its premises, or to strangers to it, or in short to anyone who is not in any way a beneficiary of its charity.

In addition there are emphatic dicta in other decisions, supporting the above mentioned adjudications. The Nevada court, in Bruce v. Y. M. C. A., 1929, 51 Nev. 372, 277 P. 798, 801, exonerated the defendant, because he was a member and beneficiary of the defendant, but the court plainly indicated by its able criticism of the various theories advanced in support of the immunity in question, what its attitude would be in a case where a nonbeneficiary was negligently injured. In speaking of what it calls "the fetish worship which influenced so many courts," it said, through Justice Coleman:

"A flood of cases might be cited holding that a charitable institution is liable for its negligence in the selection of its employees, for the negligence of its employees to strangers, or for some other reason. Every decision so holding, no matter how astutely the court may seek to evade the real question—that is, the charitable trust theory—is in fact, where the question is presented, a denial of that doctrine, for, as we have said, in substance, a charitable institution is either exempt or it is not. No sophistry, no refinement of argument, can consistently hold that a charitable institution is exempt in the one case and not exempt in the other."

Still other decisions, which indicate a drifting away from the full force of the immunity rule, are those which permit a judgment to be taken against a charitable institution, but restrict its satisfaction to property of the institution received from noncharitable sources, or to property of the trust fund which is invested in property operated separate from the charitable

institution, even though its income is used to support the charity. While the reasoning back of this appears somewhat strained, there is something to be said for it. It also indicates there is some backsliding among "fetish worshippers." The Colorado court in St. Mary's Academy of Sisters of Loretto v. Solomon, 1925, 77 Colo. 463, 238 P. 22, 42 A. L. R. 964, held that a passenger guest in an automobile of the Sisters injured through their negligence, could recover judgment against them but could not collect it from property used for the charity. In Ewing et al. v. Wm. L. Foley, Inc., Tex. Civ. App. 1922, 239 S. W. 251, the Hermann estate, by the will of the testator, was entrusted to Ewing et al., to be devoted to the establishment and maintenance of a charitable hospital. Part of these funds were invested in an office building, the net income from which was to go to the support of the hospital. In doing the excavating work the wall of the Foley building was damaged. In spite of the plan that the estate was to be used solely for charitable purposes, judgment was allowed, with directions that it should be satisfied out of such property of the Hermann estate as was used solely for revenue purposes. In Winnemore v. Philadelphia, 1901, 18 Pennsylvania Super. 625, there was a similar holding. Under the will of Stephen Girard, his property was to be devoted to the maintenance of Girard College. Part of the estate was invested in an office building separate from the college, but with its revenue dedicated to the college. The plaintiff, a tenant in the building, was injured by the negligence of its elevator operator. Judgment was allowed with recovery to be made out of the building. The Mississippi court, in Rhodes v. Millsaps College, 1937, 179 Miss. 596, 176 So. 253, 256, and the Tennessee court, in Gamble v. Vanderbilt University, 1918, 138 Tenn. 616, 200 S. W. 510, L. R. A. 1918C, 875, each, in like situations, allowed judgments identical with those of the Pennsylvania and Texas courts. There is a similar holding by the Massachusetts court in Holder v. Massachusetts Horticultural Soc., 211 Mass. 370, 97 N. E. 630, also one by the Kansas court, in McMillen v. Summunduwot Lodge, 1936, 143 Kan. 502, 54 P. 2d 985, and one by the Georgia court, in Robertson v. Executive Committee of Baptist Convention, 1937, 55 Ga. App. 469, 190 S. E. 432, in which it held that a paying patient was entitled to recovery from the hospital for its negligence, but the recovery would be restricted to the income derived from the pay

patients or other noncharitable sources. For the same reason, the fact that certain property of a citizen is exempt from execution does not forbid a creditor from taking judgment against him.

Courts holding that charitable institutions are liable in damages to the beneficiaries of the charity, must be listed on the side of the appellee in the case before us, because if they hold for the beneficiary, they must necessarily hold likewise for an employee, invitee, stranger, or other nonbeneficiary. We have already noted that the Alabama court and the Minnesota court and the New York court of appeals have so held in addition to permitting recovery by nonbeneficiaries. In addition to those three courts, those of Oklahoma, Utah and Florida, while never having passed upon the case of a nonbeneficiary, have definitely held that a beneficiary may recover for the benefactor's negligence.

The Oklahoma court, in City of Shawnee v. Roush, 1924, 101 Okla. 60, 223 P. 354, followed the Alabama ruling in the Tucker case, and allowed a recovery by a paying patient in a hospital operated by the city in the exercise of its proprietary capacity, and caused by the negligence of an attending nurse of the hospital.

There was a similar holding by the Florida court, in Parrish v. Clark, 1933, 107 Fla. 598, 145 So. 848, where a paying patient was negligently injured by a nurse.

The Utah court in the first trial of Sessions v. Thomas Dee Memorial Hospital Assn., 89 Utah 222, 51 P. 2d 229, rather intimated that it favored the immunity rule, but the facts were insufficient for it to pass on the question. In that case a small boy while recovering from an operation was negligently given morphine instead of codeine by a pupil nurse, resulting in his death. On an appeal from a judgment for plaintiff in the retrial, reported in 94 Utah 460, 78 P. 2d 645, 653, April 25, 1938, it was affirmed, with one judge dissenting. In a concurring opinion, Justice Wolfe said:

"A review of the history of the cases exempting hospitals not for profit, because of public policy, shows that it originated in a day when there were comparatively few charitable institutions apart from the great ecclesiastical organizations; that encouragement to those inclined to give to or create philan-

thropies was quite necessary; that ofttimes the charitable institutions were small with but meager funds. A single negligence action might have wiped them out.

"The same reasons do not pertain today. It would be rare indeed that any philanthropist would fail to give to a charitable use because he feared that the institution he created or contributed to might be sued for negligence and some of its funds required to compensate for negligence. More likely would he say: 'If the institution I create or give to, through its servants, injures another, it is only just that it make compensation with my funds before it uses them for the help of others. Better justice with the funds at home than charity abroad.' Hospitals may protect themselves by liability insurance.

"The CHIEF JUSTICE has cited a formidable array of authorities holding contra to the prevailing opinion in this case. I concede the great weight of authority is that way. An examination of many of the cases, I surmise, will reveal that they adopted language imported from some previous case which had in turn adopted language from still earlier cases. Few examined the question in the light of modern conditions. There was a certain amount of judicial 'goose-stepping.' But I think the trend is the other way, and I think in the not too distant future the weight of authority will be the other way. I am in favor of throwing this jurisdiction on the side of Alabama, Idaho, Minnesota, Oklahoma, and the trend in New York."

In Idaho, in Henderson v. Twin Falls County, 1935, 56 Idaho 124, 50 P. 2d 597, 101 A. L. R. 1151, recovery was allowed a paying patient in a public charitable hospital operated by the county under its proprietary power. The court was divided, three and two. But in Wilcox v. Idaho Falls Latter Day Saints Hospital, Sept. 28, 1938, 82 P. 2d 849, a privately operated charitable hospital, was held not liable for a negligently injured paying patient. It attempts to distinguish the Henderson case. The court was still badly divided, but on rehearing all concurred but the Chief Justice.

In England and her colonies as adjudicated in the cases already cited herein, the charity institution is held liable to a patient if it is established that the negligent person was the servant of the institution.

We have great respect for those courts, who, in their

opinions noted herein, have held that charitable organizations were exempt from responsibility in damages to persons injured through the negligence of those organizations, although such persons were in nowise beneficiaries thereof, but we do not believe that either sound reason and logic, or sound principles of law, or the demands of sound present-day public policy, justify those adjudications. As a matter of strict legal right the property of every person should be held by him subject to the payment of his legal obligations. But a sound public policy recognizes that the value of the property owned by a large number of individuals is so limited that to subject it to the payment of all of the individual's obligation would deprive him of shelter and sustenance for his family and throw them upon some arm of the government for support, and do great injury to their morale. To avoid this the legislatures have uniformly enacted homestead and wage exemption laws. Likewise all privately owned property should be taxed, and yet the legislature (Code section 6944) has granted certain exemptions from taxes to charitable institutions. This legislation is simply the enforcing of the proper demands of public policy. It is significant that public policy has never demanded legislation exempting charitable institutions from responsibility for their negligence. Section 8583 of the Code of Iowa, 1935, provides that corporations not for pecuniary profit may sue and be sued but there is no legislative provision that they may be sued only on contract liability. The funds of such institutions may be depleted as effectively by improvident contracts as by negligence. Where the legislature has not granted an exemption it may be questionable whether the courts have such power. If they do grant such an exemption, as we are asked to do in this case, it is only because the sound public policy of this state demands it. In earlier days such an exemption as is asked by the appellant may have been in accord with the then public policy. But public policy is not static. It changes with the changes in the times. It changes as the needs of the people, the mode of their living, and the manner and methods of doing business change. The legislatures and the courts must keep as closely abreast as they can. The administration of charities, twenty, fifty or a hundred years ago was simpler than it is now. Charitable organizations maintain large institutions and properties, both for investment purposes and for carrying on the work itself. They employ large numbers

of employees, automobiles, and the modern equipment of other business concerns. Under the appellant's theory of its liability, every plumber, painter, carpenter or mechanic of any description who would ply his trade in its building would assume the risk of its negligence, and bear its consequences. The same would be true of any other person rightfully in its building for any purpose. If it used automobiles in its business they could traverse the highways of Des Moines and the state with impunity respecting consequences of their negligence. In doing charity they might cause misery without any financial consequences. Public policy in Iowa does not demand any such immunity for its charitable institutions. Every dollar donated for charity is not spent in actual relief. Part of each dollar must go for overhead and current expense. Individuals and private business avoid the full burden of certain risks by scattering those burdens over and among the people as a whole, by insurance of various kinds. Why should not charitable institutions do the same? No doubt the appellant carries fire insurance on its large building with the thought that one day its elevator operator or other employee might be negligent with fire. If it thus protects itself why should it not spend part of its donated funds in premiums for public liability and employee liability insurance, against the day when a stranger, or an invitee, or its employee may be injured by its negligence? Everyone who donates for its charity expects it to carry such protection.

There is nothing which so begets and fosters care and diligence as responsibility. Irresponsibility breeds and encourages opposing traits. Requiring the payment of compensation for negligence serves two purposes. It pays an obligation to the injured party, and it is a warning to the offender and to the public that justice and the law insist upon the exercise of care. And nowhere is the exercise of the highest degree of care so necessary, and so to be desired, as in ministering to the sick and the helpless, and those relying entirely on the skill and superior knowledge of someone else.

The various doctrines which have been advocated in support of the immunity which we are considering, other than the public policy theory, have little of inherent or real merit to recommend them. They are but legal fictions which the courts have announced to make effective an immunity which they have conceived to be a demand of sound public policy.

Courts should be guided by sound common sense, sound principles of law, and justice. But whether we follow such guide in this case, or that of public policy, we arrive at the same conclusion, and that is that the immunity claimed should be denied the appellant. Any other conclusion would be wrong and consequently a bad precedent.

As stated by Justice Ostrander, in his concurring opinion in Bruce v. M. E. Church, 110 N. W. 951, 959, supra, there are many incorporated and unincorporated "religious, fraternal, scientific, agricultural and benevolent associations. * * * The property of most of them is contributed, and the objects and purposes are noncommercial and morally or materially beneficent. To the works of many of them the definition of charity would apply. To any total of good deeds and of beneficial public results, each corporation of the classes named will insist that it has contributed. The law cannot classify * * * them by their actual accomplishments, nor can the courts enforce or relieve from the operation of rules of proper conduct according to the net showing of beneficence."

No person would for a moment contend that the appellant or any other charitable institution should be permitted to injure or trespass upon the real property of its neighbor or someone else, in any of the many ways in which it can be done. Peden v. Furman University, 155 S. C. 1, 151 S. E. 907; Love v. Institute, 146 Tenn. 550, 243 S. W. 304, 23 A. L. R. 887; Trevett v. Prison Assn., 98 Va. 332, 36 S. E. 373, 50 L. R. A. 564, 81 Am. St. Rep. 727, ut supra. Why, then, should they be permitted to wrongfully injure the person of anyone?

Our amicus curiae says that immunity should be extended to charitable institutions, as well as to governmental organizations. It forgets that fire and police protection can be furnished properly only by fire and police departments. While the appellant and its kindred associations are doing a great work in character building, it is but a small part of the great aggregate of character building in this country. Character is built in the home, the shop, the business house, the great industries, the offices of the professions, on the farm, in the mines and in fact in all lines of endeavor. Everyone who does his work well and performs the duties of life, is building character. And yet all of these, including the teacher, the minister and everyone else

have no immunity from obligations incurred by their negligence.

Under our conception of the law and the facts in this case, and under the many authorities upholding the contention of the appellee, it is not necessary that we determine whether the deceased was a stranger to the appellant, or its invitee or its employee, because in any of these relations it would be liable to him for its negligence. The jury has found that it was negligent and we find that the evidence supports such findings.

We are indebted in our research to instructive articles by John Appleman of the Peoria bar, in his article on ''Tort Liability of Charitable Institutions,'' in 22 Am. Bar Assn. Journal, 48 (1936) ; Feezer on The Tort Liability of Charities, University of Pennsylvania Law Review, 77 Am. Law Register 191, (1928-29) ; Carl Zollman on Damage Liability of Charitable Institutions, in 19 Mich. Law Review 395-412 (1921) ; 13 Notre Dame Lawyer 107 (1937-38) ; 16 Oregon Law Review 357 (1936-37) ; 31 Harvard Law Review; 22 Virginia Law Review 58-65. All of these support our conclusion on this question. We have found no commentator who contends otherwise.

V. Appellant also contends that the deceased was guilty of contributory negligence since he voluntarily entered a place of known danger, because Anderson, appellant's superintendent, took the interlock or safety catch off of the elevator door equipment in the presence of the deceased. There is nothing to indicate that he either saw or appreciated what was done in this respect. And if he did he had a right to rely upon the fact that the elevator operator had been twice told not to come below the first floor with the elevator. He was not required to anticipate the negligent violation of this instruction. Contributory negligence is ordinarily a question for the jury, and it was in this case.

VI. Appellant insists that the verdict was excessive, given under the influence of passion and prejudice, and unsupported in fact or law. The jury returned a verdict for $21,886.50. The trial court reduced it to $15,000, and entered judgment for that amount. The deceased was terribly injured and every day of the fourteen months that he lived thereafter was one of extreme pain in spite of sedatives. Nurses and doctors testified to his severe pain. We dislike to give the details of his injuries, but it is necessary on this issue. He sustained severe injuries

including a broken back and was paralyzed below the waist. He had terrible bed sores. He had to be turned on his abdomen for so many hours each day, which would not allow any incision to heal. There was a bad wound in his abdomen, and he was turned on an iron frame during certain hours of the day on to his abdomen, but the pain would be so severe that he could not stand it for too long at one certain place. His entire back from the upper part of his lumbar region down to the coccyx was one large sore, till the bone almost protruded in places. The sores and spots on his back were from one-half to one inch deep. He could not turn himself, nor did he have the use of his bowels, and his urine was involuntary at all times. He had severe pain and would cry with the pain that he experienced in the upper part of his back. Pain was so severe that he rubbed his face so much from the pain that he had his face just a mass of sores. His urine was drained from the bladder into a bottle, which caused him a lot of distress, because it would not drain a lot of times. He got so bad that he was not able to take very much nourishment and the bed sores and the sores all along his back were getting a lot worse and he became very emaciated. Prior to receiving said injuries Arthur Andrews was in good health and working every day. He was at the hospital and suffered every minute he was alive and could not be removed from the hospital. His death was the result of these injuries, including an infection of the ulcers on the back and infection of the bladder. There were twenty-one bruises on the right side of his body where the rounds of the ladder went into his body. He had a large surgical wound due to the super pubic which had to be put into his bladder. The wounds on his body never healed.

He had a high school education and some college training. He was an excellent carpenter. He was sober and industrious. Up until 1929 he earned around $7.50 a day. He was 54 years old at his death and had a life expectancy of almost sixteen years. He was getting $65 a month when injured. His doctor and hospital expense was $2,386.50. His loss in earnings from his injury until his death was $900. He had no property when he died. While this last fact is an important factor for the jury to consider in arriving at the amount of damages, it is not a controlling one. A person's ability to earn money is a more vital element. It was his earning capacity which was destroyed by his injury. He had almost sixteen years of life expectancy,

and a carpenter's work is such that he can continue to a greater age than those who do heavier labor. What his future savings might have been were problematical, and their amount, within reason, was for the jury to say. The extreme suffering which he undoubtedly suffered would warrant a very substantial allowance for that item. A large discretion is vested in a jury in fixing the amount of damages for the death of a person. Nicoll v. Sweet, 163 Iowa 683, 144 N. W. 615, L. R. A. 1918C, 1099, Ann. Cas. 1916C, 661. The assets of a great many people diminished greatly from 1929 on. Many with substantial accumulations and good earning capacity were compelled to live on their past savings. There is nothing in the record to warrant any finding that the jury were influenced by passion or prejudice. We believe that the trial court has already sufficiently reduced the jury's verdict.

VII. The court gave the following instruction to the jury:

''In determining what amount, if any, your verdict in plaintiff's favor should be because of decedent's death, if you find under the evidence and these instructions that the plaintiff is entitled to recover for decedent's death, you are instructed that the measure of such recovery will be the present worth or value of the net estate which you find the deceased reasonably would have saved and accumulated from the time of his death if he had lived the normal term of his life.

''In measuring the said damages, if any, you may take into consideration, as shown by the evidence, the age of the decedent at the time of his death, his occupation and earnings preceding the accident which caused his death, the condition of his health, the probable length of life that was before him, the expenses of living, the amount that he would likely expend for various purposes usually made by one in his situation in life, and all other evidence throwing any light upon the question of the amount of said damages, and then determine from all such evidence the probable financial and pecuniary loss, if any, to decedent's estate caused by his premature death, allowing the plaintiff the present worth thereof, which should be such an amount, if any, and only such an amount as in your judgment will compensate decedent's estate for his death.

''By 'present worth,' as used in these instructions, is meant such a sum, as being paid presently, or as the result of this suit,

on an impartial approximate estimate, will afford just and reasonable compensation for the loss to the estate of plaintiff's decedent, if you find from the evidence she is entitled to recover any amount for such item.''

■ Appellant complains because the court did not specifically tell the jury that the amount the deceased would have spent should be considered by them only for the purpose of reducing the amount to be recovered. We see no merit in this exception. Whether, what the deceased spent would increase or decrease his estate at death would depend on whether he spent little or much. Appellant also excepts to the instruction because the jury was not more definitely instructed as to the term ''present worth''. While the matter of present worth might well have been more fully stated, we think the jury could not have been misled as to its meaning. Not having asked for a more explicit instruction, the appellant is in no position to attack the instruction on this ground. Cuthbertson v. Hoffa, 205 Iowa 666, 670, 216 N. W. 733; Hutcheis v. Ry., 128 Iowa 279, 284, 103 N. W. 779.

There is no error shown calling for a reversal of the judgment entered below and it is affirmed.—Affirmed.

MITCHELL, C. J., and SAGER, HALE, and STIGER, JJ., concur.

MILLER, J., being of attorneys for appellant, took no part.